[No. A110074. First Dist., Div. Three. Oct. 6, 2006.]

STOP LOSS INSURANCE BROKERS, INC., et al., Cross-complainant and Appellant, v.
BROWN & TOLAND MEDICAL GROUP, Cross-defendant and Respondent.

Jones, Bell, Abbott, Fleming & Fitzgerald, Michael J. Abbott, John L. Erikson, Jr., William M. Turner and Jill M. Buresh for Cross-complainant and Appellant.

Hanson, Bridgett, Marcus, Vlahos & Rudy, Michael A. Duncheon and Jahmal T. Davis for Cross-defendant and Respondent.

## OPINION

**McGUINESS, P. J.**—After it was sued for breach of contract and negligence by the Regents of the University of California (Regents), Stop Loss Insurance Brokers, Inc. (Stop Loss), filed a cross-complaint for comparative indemnity against Brown & Toland Medical Group (BTMG). Following two rounds of amendments, the trial court sustained a demurrer to the cross-complaint without leave to amend. We affirm the judgment.

## BACKGROUND

As operator of the University of California at San Francisco Medical Center (UCSF Medical Center), the Regents participated in a capitated health care program, through which they contracted with various health care plans to provide services for patients in exchange for fixed, or "capitated," payments. Such payments were made to the Regents through BTMG, and UCSF Medical Center was a designated hospital provider for BTMG plan members.

Hospitals participating in this capitated health care program were required to carry insurance coverage for charges exceeding a fixed amount. In March 2000, the Regents sought bids from insurance brokers to obtain the necessary insurance coverage. Shortly thereafter, the Regents retained Stop Loss and instructed it to procure a $1-million-per-claim insurance policy.

Under the policy Stop Loss procured, the Regents were required to notify the insurer of any potential and actual claims exceeding 50 percent of the policy's deductible. BTMG and Stop Loss worked together to provide this information to the insurer on a monthly basis. Every month, BTMG analyzed the Regents' claims to identify the ones that required notice to the insurer. BTMG sent this information to Stop Loss, and Stop Loss prepared the necessary claims forms. Stop Loss then sent the forms to BTMG for approval, and, once approved, BTMG forwarded the forms to the insurer for payment.

In 2001, a new insurance policy Stop Loss had procured expressly precluded coverage for any preexisting claim not disclosed by the Regents. The Regents signed a binder that purported to disclose all reportable claims, but unbeknownst to them the binder did not include a disclosure of the claim made by a BTMG plan member who had been repeatedly hospitalized for renal failure. When this patient's claim was submitted to the insurer for payment later in 2001, it was denied.

On October 6, 2003, the Regents filed a complaint against Stop Loss for breach of contract and negligence. The Regents alleged BTMG had submitted timely information to Stop Loss about the patient's renal failure claim but Stop Loss failed to prepare the form for reporting it in a timely fashion. As a result, the complaint claimed Stop Loss breached its contractual agreement with the Regents and also breached its professional duty of care as the Regents' insurance broker, causing the Regents to suffer a loss of over $1 million in unreimbursed expenses for the claim.

Stop Loss answered the complaint and filed a cross-complaint against BTMG. After the trial court sustained a demurrer to this pleading, Stop Loss filed a second amended cross-complaint against BTMG for comparative equitable indemnity and declaratory relief. In it, Stop Loss described the procedure it had established with BTMG to report claims to the Regents' insurer, though it noted this system "was not established pursuant to a contract."[1] Because BTMG knew its failure to analyze claims properly and submit information to Stop Loss in a timely fashion could result in the denial

---

[1] In contrast to the Regents' complaint, the cross-complaint alleged BTMG, not Stop Loss, decided which claims required notice and BTMG, not Stop Loss, was responsible for sending claims forms to the insurer.

of insurance coverage for such claims, the cross-complaint alleged "BTMG owed a duty to [the Regents] to analyze claims properly, provide claims information to Stop Loss timely, and submit claim forms to the reinsurer timely." (Fn. omitted.) Stop Loss alleged BTMG breached this duty to the Regents because it did not make Stop Loss aware of the subject claim until well after the Regents had signed the disclosure form for the new insurance policy. As a result, the cross-complaint claimed BTMG was obligated to partially or fully indemnify Stop Loss for any damages it might be compelled to pay to the Regents. The trial court sustained a demurrer to Stop Loss's second amended cross-complaint without leave to amend, noting the cross-complaint "fail[ed] to state sufficient facts to give rise to a duty owed by BTMG to [the Regents] sounding in tort." This appeal followed.

## DISCUSSION

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

██ It is well settled in California that equitable indemnity is only available among *tortfeasors* who are jointly and severally liable for the plaintiff's injury. (*Leko v. Cornerstone Bldg. Inspection Service* (2001) 86 Cal.App.4th 1109, 1115 [103 Cal.Rptr.2d 858]; *Munoz v. Davis* (1983) 141 Cal.App.3d 420, 425 [190 Cal.Rptr. 400].) With limited exception, there must be some basis for tort liability against the proposed indemnitor. (*Munoz v. Davis, supra*, 141 Cal.App.3d at p. 425.) "Generally, it is based on a duty owed to the underlying plaintiff [citations], although vicarious liability [citation] and strict liability [citation] also may sustain application of equitable indemnity. In addition, implied contractual indemnity between the indemnitor and the indemnitee can provide a basis for equitable indemnity. [Citation.]"

*(BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 852 [14 Cal.Rptr.3d 721].)[2]

The cross-complaint here does not allege vicarious or strict liability, nor an implied contractual obligation for BTMG to indemnify Stop Loss. Rather, after describing the process by which BTMG and Stop Loss analyzed claims and gave notice to the insurer, and alleging BTMG understood the consequences that could result from the failure to disclose a qualifying claim to the insurer, the cross-complaint simply asserts, "BTMG owed a duty to Plaintiff [the Regents] to analyze claims properly, provide claims information to Stop Loss timely, and submit claims forms to the reinsurer timely." Asserting this legal conclusion does not make it so, however. The question is whether, with respect to the claims analysis, BTMG owed the Regents a duty of care *sounding in tort.* While the cross-complaint alleges that "BTMG . . . assumed and understood its duties" under the parties' system for disclosing claims, this obligation could only have arisen out of the business relationship between BTMG and the Regents. The law imposes no duty on strangers to promptly process another's data that is comparable to the duty imposed on all persons to exercise due care to avoid injuring others. (See, e.g., *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 59 [77 Cal.Rptr.2d 709, 960 P.2d 513] ["With rare exceptions, a business entity has no duty to prevent financial loss to others with whom it deals directly"].) At most, if BTMG assumed a duty to process claims in a timely fashion, and the Regents relied on BTMG to do so, BTMG's performance was undertaken pursuant to an implied contract.

 ■ "A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, ' "[c]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." ' [Citation.]" (*Aas v. Superior Court* (2000) 24 Cal.4th 627, 643 [101 Cal.Rptr.2d 718, 12 P.3d 1125], superseded by statute on another ground as stated in *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1079–1080 [135 Cal.Rptr.2d 361, 70 P.3d 351].) Despite the cross-complaint's use of negligence terminology, the alleged misconduct by BTMG describes, at most, a breach of contract, not a breach of a legal duty of care. In short, "This is an improper attempt to recast a breach of contract cause of action as a tort claim. Nor is there any social policy that would demand resort to tort remedies. Without any action

---

[2] As the concurring opinion recognizes (conc. opn., *post,* at pp. 1049–1051, 1054–1055), California law does not permit equitable apportionment of damages for breach of contract, and we are not bound to follow an out-of-state decision adopting a contrary rule. (See conc. opn., *post,* at p. 1053, discussing *In re Consol. Vista Hills Litigation* (1995) 119 N.M. 542 [893 P.2d 438].)

sounding in tort, there is no basis for a finding of potential joint and several liability on the part of [cross-]defendant [BTMG], thereby precluding a claim for equitable indemnity." (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc., supra*, 119 Cal.App.4th at p. 853.)

Nevertheless, Stop Loss argues a duty of care on the part of BTMG can be inferred from the factors outlined in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16] (*Biakanja*), and applied in *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 804 [157 Cal.Rptr. 407, 598 P.2d 60] (*J'Aire*). These cases are distinguishable, however, and they do not support extending a tort duty to business parties' arms-length dealings. In *Biakanja*, the defendant was a notary who owed a professional and a contractual duty to the client for whom he drafted a will (see *Biakanja, supra*, 49 Cal.2d at p. 648); in *J'Aire*, the defendant was a general contractor who owed a contractual duty to the owner of premises it was working to improve. (See *J'Aire, supra*, 24 Cal.3d at p. 802.) In both cases, the question was whether the defendant's duty of care could be extended to a third party who was not in privity—i.e., the intended beneficiary of a will (*Biakanja, supra*, 49 Cal.2d at pp. 648–649) or the lessee of premises that were being improved (*J'Aire, supra*, 24 Cal.3d at p. 802). The Supreme Court held that whether a defendant owes a duty of care to third parties in such a situation depends upon a balancing of six factors: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm. [Citation.]" (*J'Aire, supra*, 24 Cal.3d at p. 804; see *Biakanja, supra*, 49 Cal.2d at p. 650.)

Contrary to Stop Loss's assumption, courts have not applied the *Biakanja* factors to create broad tort duties in arms-length business dealings whenever it is convenient to resort to the law of negligence. *Biakanja* and *J'Aire* address the specific situation that arises when (1) the defendant was acting pursuant to a contract, and (2) the defendant's negligent performance of the contract injures a third party. Neither of these prerequisites is met in this case. First, the cross-complaint alleges BTMG's handling of the Regents' claims was not undertaken pursuant to a contract. Second, and more importantly, even if one concludes BTMG was acting pursuant to an implied contract with the Regents, the cross-complaint does not allege BTMG injured any *third party*. Rather, Stop Loss claims BTMG's negligent claims-handling injured the Regents by causing it to lose insurance coverage.[3] As noted, the Regents

---

[3] Our concurring colleague's assertion that Stop Loss is the injured third party (conc. opn., *post*, at p. 1062, fn. 11) ignores the allegations of the cross-complaint and turns *Biakanja* on its head. Stop Loss did not allege it was the injured party. Rather, consistent with the requirements

may not recover in tort for BTMG's breach of a contractual obligation. (See *Aas v. Superior Court, supra*, 24 Cal.4th at p. 643.) Invoking the *Biakanja* factors to create a tort duty in the absence of injury to a third party would circumvent this rule and blur the law's distinction between contract and tort remedies. Stop Loss has cited no case holding a business entity owes a tort duty of care to prevent another business from suffering purely financial losses, and we decline to announce such a duty here.

Likewise, very little precedent supports our concurring colleague's theory that equitable indemnity may be had based upon breach of an implied tort duty arising from negligent performance of an implied contract. (Conc. opn., *post*, at pp. 1056–1057, 1059–1062.) In *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774 [69 Cal.Rptr.2d 466], the Court of Appeal described the common law duty contracting parties have to perform with reasonable care, skill, expedience and faithfulness, and stated that "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts. [Citation.]" After quoting this statement from *North American Chemical*, the Supreme Court in *Erlich v. Menezes* qualified it by noting that "conduct amounting to a breach of contract becomes tortious only when it also violates a duty *independent of the contract* arising from principles of tort law. [Citation.] ' " '*An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty.*' " ' [Citation.]" (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 551 [87 Cal.Rptr.2d 886, 981 P.2d 978], italics added.) The high court proceeded to the central question, "is the mere negligent breach of a contract sufficient?" and responded with an unequivocal "no." (*Id.* at p. 552.) The court explained that the remedy for a breach of contract is generally limited to contract law, and recovery in tort is not permitted unless: " '(1) [T]he breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.' [Citation.]" (*Id.* at pp. 553–554.)

---

of a claim for equitable indemnity, the cross-complaint alleged BTMG's breach of duty—a duty Stop Loss sought to infer based on the *Biakanja* factors—was a concurrent cause of the economic loss *the Regents* suffered. The novel analysis in the concurrence applies *Biakanja* to conclude that BTMG owed an implied duty of care to Stop Loss to avoid causing an injury for which Stop Loss, if it also acted negligently, could be held concurrently liable. Not surprisingly, our colleague cites no case extending *Biakanja* to find a duty of care among joint tortfeasors (or contract breachers) to prevent losses that will not be subject to equitable apportionment. It is hard to envision where such an expansive duty would end.

Even though no implied contract was pleaded in the cross-complaint, nor the breach of any duty of care arising from such an implied contract, and even though the Supreme Court has expressly held that the negligent breach of such a duty does not give rise to tort damages, the concurring opinion argues breach of the common law duty discussed in *North American Chemical* can support a claim for equitable indemnity. The concurrence cites no authority for this position, but merely asserts that the policy reasons courts have resisted expanded tort liability do not apply in the context of equitable indemnity. While that may be true, it is hard to see why a tortfeasor should receive the windfall of an equitable set-off when the law precludes the injured party from recovering tort damages for the same wrongful conduct. Why should the law favor the wrongdoer with a more advantageous measure of damages?[4] We decline to apply an inconsistent rule—converting a breach of contract into a tort for some purposes but not others—absent authority for doing so. "If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies." (*Erlich v. Menezes, supra*, 21 Cal.4th at p. 554.) Because negligent performance of a contract gives rise to contract damages only (*id.* at pp. 552–554), such alleged negligence will not support a claim for equitable indemnity.

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

Parrilli, J., concurred.

**POLLAK, J.,** Concurring.—Although I concur in the judgment for the limited reason explained in part II.3., *post*, I believe that the issues presented by the pleadings in this case present an opportunity for reconsideration of some basic principles concerning the law of equitable indemnity. If two parties breach separate contracts with a third party, jointly causing indivisible damage to the third party, and the injured party seeks recovery from only one of the two defaulting parties, is there any good reason for which that party should not be entitled to equitable indemnity from the second defaulting party? If two parties jointly cause harm to a third party, one by an act of negligence and the other by negligently breaching a contractual obligation,

---

[4] In response to this question, the concurring opinion resorts to the general policy supporting equitable indemnity among joint tortfeasors. (Conc. opn., *post*, at p. 1060, fn. 9, quoting *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 607–608 [146 Cal.Rptr. 182, 578 P.2d 899].) But this answer does not suffice because, contrary to the application of equitable indemnity in a typical tort case, here indemnity is sought for a measure of damages—i.e., tort—that the plaintiff itself is precluded by law from recovering.

and the injured party seeks recovery from only the former, is there any good reason for which that party should not be entitled to equitable indemnity from the latter? Although the decision of the trial court and the majority precluding indemnity in such situations rests on what appears to be well-settled law, I believe that closer analysis of the underlying principles calls for a different conclusion.

## I. FACTUAL AND PROCEDURAL HISTORY

In October 2003, the Regents of the University of California (the Regents), as operator of the University of California at San Francisco Medical Center (UCSF Medical Center) filed a complaint against Stop Loss Insurance Brokers, Inc. (Stop Loss) alleging causes of action for breach of contract and negligence. The complaint alleges in relevant part that in 2000, the Regents participated in a capitated health care program. The Regents "contracted with various health care plans to provide services to plan enrollees in exchange for fixed or 'capitated' payments. At all relevant times, such capitated payments to [the Regents] were made through Brown & Toland Medical Group ('BTMG') and, as such, [the UCSF Medical Center] was deemed the 'in-area' hospital provider facility for BTMG plan members. BTMG managed premium payments and recoveries for the [Regents]. As a condition of participating in a capitated health care program, the [Regents] were required to carry insurance covering charges in excess of a fixed amount that the hospitals would be responsible for under the capitated program." The Regents retained Stop Loss as its broker to procure the necessary insurance. Stop Loss represented that it "would be responsible for securing cost-effective insurance for [the Regents], which included gathering the information necessary for the insurance application and processing the insurance application. Stop Loss also . . . would gather all claims information for hospital patients from BTMG and submit the information <u>directly</u> to [the Regents'] reinsurer." (Original underscoring.)

"[I]n 2001," the complaint continues, "Stop Loss assumed <u>all</u> responsibility for claims submissions. Stop Loss did so by first meeting with BTMG and [the Regents'] officials and advocating a new program that allowed Stop Loss to take over all steps involved in the claim submission process from data analysis to claim-denial appeal. [The Regents] agreed and in 2001, BTMG provided Stop Loss with monthly electronic data of those claims that might require notice to the reinsurer. Stop Loss would review the electronic data, revise the information and decide what claims needed to be sent to the reinsurer. Stop Loss would then complete a 'Hospital Excess Managed Care Claim Form,' send it to BTMG for *pro forma* approval, BTMG would send the form back to Stop Loss and then Stop Loss would forward the form to the reinsurer for payment." The reinsurance policy required the Regents to notify

the insurer of any potential or actual claims exceeding 50 percent of the Regents' deductible. The Regents' complaint alleges that "BTMG timely submitted [information regarding the claim in question] to Stop Loss through its monthly electronic data information" and that the Regents suffered damages in excess of $1 million when its insurer denied a claim because Stop Loss failed to submit the claim to the insurer in a timely manner.[1]

Stop Loss filed an answer denying the allegations and also a cross-complaint against BTMG for comparative equitable indemnity and declaratory relief. The cross-complaint was amended twice in response to demurrers filed by BTMG. As amended, Stop Loss's cause of action for comparative indemnity alleges that any damage sustained by the Regents as a result of the failure to timely notify the insurer of the potential claim was caused entirely or partially by BTMG and that, as a result, BTMG is obligated to partially or fully indemnify Stop Loss for any sums that Stop Loss may be compelled to pay the Regents as damages. The cross-complaint alleges that "[i]n order to provide the requisite notice of such claims to the reinsurer, [the Regents], BTMG, and Stop Loss established a system under which information was exchanged among them (the 'System'). Although the System was not established pursuant to a contract, [the Regents], BTMG and Stop Loss each assumed and understood its duties under the System. [¶] Within the System, [the Regents] provided claims information to BTMG. BTMG used that information to determine whether a claim required notice to the reinsurer. BTMG then notified Stop Loss of its determinations and provided claims information to Stop Loss. [The Regents] relied on BTMG to properly analyze the patients' claims and to report timely claims of which notice to the reinsurer was required. [¶] After it received the information from BTMG, Stop Loss input the information into certain forms. After it prepared the forms, Stop Loss sent the forms to BTMG for approval. Once BTMG approved the forms prepared by Stop Loss, BTMG sent the forms to the reinsurer. Receipt of the forms by the reinsurer constituted notice to the reinsurer of potential or actual patient claims reflected in the forms which exceed or might exceed 50% of [the Regents'] deductible. . . . [¶] . . . BTMG knew that if it did not analyze claims properly, provide claims information to Stop Loss timely, and submit claims forms to the reinsurer timely, a required claim might not be disclosed to the reinsurer within the time permitted. . . . BTMG owed a duty to [the Regents] to analyze claims properly, provide claims information to Stop Loss timely and submit claims forms to the reinsurer timely." (Fn. omitted.)

---

[1] The complaint also alleges that Stop Loss failed to procure the proper amount of insurance coverage.

According to Stop Loss's pleading, BTMG did not notify it of the claim in question until August 2001, "well after" the claim was required to be disclosed. "BTMG's failure to report [the claim in question] constituted a breach of its duty to [the Regents]." Stop Loss further alleged, on information and belief, "that if [the Regents] suffered any damage as a result of the failure to timely submit a claim to the reinsurer, such a failure is the result of BTMG's acts or failures to act, and not of any act or failure to act of Stop Loss. BTMG owed a duty of care to [the Regents] to analyze its patients' claims properly, to report claims information to Stop Loss timely, and to submit claims forms to the reinsurer timely. BTMG breached this duty. Therefore, if it is determined that [the Regents] sustained damage and [are] entitled to recover from Stop Loss, BTMG should be required to indemnify Stop Loss."

BTMG demurred to the cross-complaint on the ground that it failed to allege that BTMG owed a duty of care to the Regents with regard to the manner in which it analyzed claim information. The trial court found that the "second amended cross-complaint fails to state sufficient facts to give rise to a duty owed by BTMG to [the Regents] sounding in tort" and sustained the demurrer without leave to amend. A judgment dismissing the cross-complaint was entered thereafter. Stop Loss timely filed a notice of appeal.

## II. DISCUSSION

### 1. *Standard of review*

Since we are reviewing the sufficiency of Stop Loss's cross-complaint, we must assume the truth of all well-pleaded facts in that pleading. (*Jones v. American President Lines* (1957) 149 Cal.App.2d 319, 322 [308 P.2d 393].) To the extent that the Regents' complaint contains contrary allegations, we must, for purposes of evaluating the demurrer, accept Stop Loss's version of the facts. (*Ibid.*) The sufficiency of the cross-complaint presents a pure question of law, which this court must review de novo. (*Filet Menu, Inc. v. Cheng* (1999) 71 Cal.App.4th 1276, 1279 [84 Cal.Rptr.2d 384].)

### 2. *Stop Loss's cross-complaint sufficiently alleges a cause of action for equitable indemnity.*

#### a. *The issues defined*

The trial court's ruling that the cross-complaint fails to state a cause of action for comparative equitable indemnity, upheld in the majority opinion, rests on two premises: first, that equitable indemnity is available only as between joint tortfeasors, and may not be obtained from a party whose

liability is based solely on breach of contract; and secondly, that the failure to perform a contractual obligation that causes only monetary damages may not be the basis for tort liability. Both of these broad propositions require more careful consideration.

The cross-complaint alleges that BTMG was wholly or partially responsible for the Regents' financial loss, but the sufficiency of this pleading is significant only if partial responsibility is assumed. If the evidence proves that BTMG was wholly responsible for the Regents' loss, then Stop Loss bears no liability and the sufficiency of its cross-complaint is academic. The issues are framed only by assuming to be true, as we must, that the actions or failures to act of both Stop Loss and BTMG jointly gave rise to a single economic loss to the Regents, namely, the loss of $1 million of insurance coverage.

The Regents' complaint against Stop Loss alleges both breach of the Regents/Stop Loss contract, and negligent breach of Stop Loss's professional duties as an insurance broker.[2] The cross-complaint alleges that BTMG's liability arises from its failure to perform under the "system" established by the three parties for the processing of information. "Although the System was not established pursuant to a contract," the cross-complaint reads, "[the Regents], BTMG, and Stop Loss each assumed and understood its duties under the System." This allegation is essentially self-contradictory, undoubtedly made in an attempt to avoid the rule that equitable indemnity may not be obtained from one who contributed to a loss only by breaching a contractual obligation. As the majority opinion points out (maj. opn., *ante*, at p. 1042), the law imposes no duty on strangers to promptly process another's commercial data comparable to the duty imposed on all persons to exercise due care to avoid injuring others. If, as Stop Loss's cross-complaint alleges, BTMG "assumed and understood" an obligation to the Regents to timely process and forward insurance data, that obligation necessarily was based on an implied agreement arising out of the business relationship between those two parties.[3] The Regents' complaint confirms the existence of a business relationship between the Regents and BTMG. While the precise terms of the arrangement are not specified, the Regents allege that "BTMG managed premium payments and recoveries for the [Regents]." The duties that BTMG assumed pursuant to that arrangement are necessarily the source of any obligations that BTMG owed to the Regents.

---

[2] The negligence cause of action also alleges that the duties Stop Loss failed to perform arose from its representations that it would perform them.

[3] Stop Loss alleges no breach of any contract between itself and BTMG.

Thus, consistent with the allegations of the cross-complaint, it must be assumed that BTMG did not timely transmit to Stop Loss the information necessary for the submission of the reinsurance claim as it had undertaken to do, that once received, Stop Loss did not diligently process and forward the information, and that as the combined result of both delays the reinsurer did not receive timely notification and the Regents were unable to recover on the reinsurance claim. Under these assumptions, Stop Loss is liable to the Regents for the full amount of the loss. The issue is whether, under these assumptions required by the pleadings, there is any good reason why Stop Loss should not be entitled to recover from BTMG a portion of the liability corresponding to its proportionate share of the fault in jointly causing the loss.

### b. *The limitation of equitable indemnity to joint tortfeasors*

The first premise on which the decision of the trial court and the majority rests undoubtedly correctly reflects the current state of California law. "Indemnity has been defined as the obligation resting on one party to make good a loss or damage another party has incurred. [Citation.] In this state the obligation may arise from either of two general sources: 'First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source in equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case.' " (*Kramer v. Cedu Foundation, Inc.* (1979) 93 Cal.App.3d 1, 9 [155 Cal.Rptr. 552], quoting *E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 506–507 [146 Cal.Rptr. 614, 579 P.2d 505].)

With respect to the latter, with which we are here exclusively concerned, "the equitable indemnity doctrine originated in the common sense proposition that when two individuals are responsible for a loss, but one of the two is more culpable than the other, it is only fair that the more culpable party should bear a greater share of the loss. Of course, at the time the doctrine developed, common law precepts precluded any attempt to ascertain comparative fault; as a consequence, equitable indemnity, like the contributory negligence doctrine, developed as an all-or-nothing proposition." (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 593 [146 Cal.Rptr. 182, 578 P.2d 899].) However, in *American Motorcycle* the Supreme Court concluded that the rationale that prompted abandonment of the rule precluding recovery by a contributorily negligent plaintiff in favor of a doctrine of comparative fault "applies equally to the allocation of responsibility between

two or more negligent defendants and requires a modification of this state's traditional all-or-nothing common law equitable indemnity doctrine." (*Id.* at p. 607, citing *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226].) The court "concur[red] with Dean Prosser's observation in a related context that '[t]here is obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were . . . unintentionally responsible, to be shouldered onto one alone, . . . while the latter goes scot free.' " (*American Motorcycle Assn. v. Superior Court, supra,* at pp. 607–608, quoting Prosser, Law of Torts (4th ed. 1971) § 67, p. 433; see also *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1029–1030, fn. 10 [269 Cal.Rptr. 720, 791 P.2d 290].)

"Originally applied to defendants whose negligence caused the plaintiff's loss (see, e.g., *American Motorcycle Assn. v. Superior Court, supra,* 20 Cal.3d 578), the Supreme Court later expanded the doctrine [of comparative equitable indemnity] to allow apportionment of loss between a negligent plaintiff and a strictly liable defendant [citation], and between a defendant liable in strict liability and negligence and a defendant strictly liable." (*GEM Developers v. Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419, 427 [261 Cal.Rptr. 626].) Comparative indemnity has been made available to apportion liability between two parties who are strictly liable. (*Gentry Construction Co. v. Superior Court* (1989) 212 Cal.App.3d 177 [260 Cal.Rptr. 421].) Yet, for largely historical reasons, equitable indemnity has been limited to cases in which the indemnitor's liability is based on tort principles. "Although the body of law defining and applying principles of equitable indemnity has not fully gelled but is still evolving, one thing is clear: The doctrine applies only among defendants who are jointly and severally liable to the plaintiff. [Citation.] As plaintiff maintains, joint and several liability in the context of equitable indemnity is fairly expansive. We agree it is not limited to 'the old common term "joint tortfeasor" . . . .' It can apply to acts that are concurrent or successive, joint or several, as long as they create a detriment caused by several actors. [Citation.] [¶] One factor is necessary, however. With limited exception, there must be some basis for tort liability against the proposed indemnitor. [Citation.] Generally, it is based on a duty owed to the underlying plaintiff . . . ." (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 852 [14 Cal.Rptr.3d 721] (*BFGC*)[4]; see also *Leko v. Cornerstone Bldg. Inspection Service* (2001) 86 Cal.App.4th 1109, 1115 [103 Cal.Rptr.2d 858]; *GEM Developers v. Hallcraft Homes of San Diego, Inc., supra,* at pp. 430–431; *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 212 [227 Cal.Rptr. 887] ["The concept of joint tortfeasors for the purpose of indemnity is explained in

---

[4] As the court there goes on to note, vicarious liability, strict liability and implied contractual indemnity may also provide a basis for equitable indemnity. (*BFGC, supra,* 119 Cal.App.4th at p. 852.)

the restatement as '. . . two or more persons who are liable to the same person for the same harm. It is not necessary that they act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants. The rule stated applies to all torts . . .' " (italics omitted)].)

The historical limitation excluding contract liability from the scope of equitable indemnity is consistent with the manner in which damages are awarded in a simple two-party breach of contract action. In order to recover for breach of contract, the nonbreaching party must prove that it has substantially performed the conditions of the breaching party's performance (or that performance was excused). If it fails to do so, it obtains no recovery. If it does establish this predicate, it is entitled to recover all damages foreseeably caused by the other party's breach. (*Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1063 [235 Cal.Rptr. 813]; see Rest.2d Contracts, § 235, com. b, p. 212 ["[w]hen performance is due, . . . anything short of full performance is a breach, even if the party who does not fully perform was not at fault and even if the defect in his performance was not substantial"]; III Farnsworth on Contracts (3d ed. 2004) § 12.8, pp. 195–196 ["contract law is, in its essential design, a law of strict liability"].) Thus, contract damages normally are awarded on an all-or-nothing basis. While the breaching party is liable only for damages foreseeably caused by its breach, there is no apportionment of that amount even if less than perfect performance of the conditions by the nonbreaching party contributed in some measure to the loss. (*Bruckman v. Parliament Escrow Corp.*, *supra*, at p. 1063; see 11 Corbin on Contracts (rev. ed. 2005) § 55.9, pp. 31–32.)

The wisdom of this approach has not gone unquestioned. (See Phillips, *Out with the Old: Abandoning the Traditional Measurement of Contract Damages for a System of Comparative Fault* (1999) 50 Ala. L.Rev. 911.) The author of this article argues that measuring damages for breach of contract by apportioning liability based on the percentage of fault in causing a breach would be more efficient and more equitable than the current system that is based on the expectations of the nonbreaching party. He argues, "The objective of expectation damages is to give the non-breaching party the benefit of his bargain. Essentially, this system of damages is one of strict liability that operates without regard to fault. In other words, the breaching party bears the full brunt of damage assessment regardless of the non-breaching party's contributions to the breach. Commentators justify this strict liability system by urging that it prevents the courts from becoming entangled in an individual's freedom to contract. Still others note that this system avoids costly and time-consuming efforts of determining fault. [¶] However, damage systems that assess fault on the basis of strict liability are generally unfair and

inequitable. The application of strict liability for contract damages leads to inefficiencies in the market system because the breaching party does not face the proper incentives to avoid breach." (*Id.* at pp. 913–914, fns. omitted.) In his opinion, "adapting the tort concept of comparative fault to contract damages is a workable alternative to the doctrine of expectation. A damages system in contract based on comparative fault will encourage contracting parties to carry out their respective obligations and, as a result, create a more efficient and equitable doctrine of liabilities for breach." (*Id.* at p. 914.) "The proposed system of comparative fault for contract damages is actually an exercise in apportionment. Should courts adopt and apply this system consistently, they would compare the parties' respective fault in causing breach and apportion the cost of that breach accordingly." (*Id.* at p. 922.)

California courts have made a small step in this direction. Rejecting the prior all-or-nothing rule, courts have applied apportionment principles to allocate contractual liquidated damages where delays in construction projects have been caused both by the owner and by the contractor. (*Jasper Construction, Inc. v. Foothill Junior College Dist.* (1979) 91 Cal.App.3d 1 [153 Cal.Rptr. 767]; see also *Nomellini Constr. Co. v. State of California ex rel. Dept. of Wat. Resources* (1971) 19 Cal.App.3d 240, 246 [96 Cal.Rptr. 682] ["categorical statements that where delays are caused on both sides there is no way to 'apportion damages' are an absurdity"]; Unruh & Worden, *Liquidated Damages for Delay in Completion of Commercial Construction Projects: Are They Recoverable by the Owner When the Owner Contributes to the Delay?* (1993) 34 Santa Clara L.Rev. 1.)

Some courts in other jurisdictions have applied this reasoning to permit indemnity from a party whose liability is based solely on breach of contract. In *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.* (1973) 297 Minn. 118 [211 N.W.2d 159], and later in *Lesmeister v. Dilly* (Minn. 1983) 330 N.W.2d 95, 102, the Minnesota Supreme Court recognized "a rule of damage apportionment applicable where two persons independently and unintentionally breach separate contracts to the same person." The *Lesmeister* court explained, "Where A and B owe contract duties to C under separate contracts, and each breaches independently, and it is not reasonably possible to make a division of the damage caused by the separate breaches closely related in point of time, the breaching parties, even though they acted independently, are jointly and severally liable." (*Ibid.*; see also *S. J. Groves & Sons Co. v. Warner Co.* (3d Cir. 1978) 576 F.2d 524, 527–528, fn. 3 [upholding apportionment of contract damages where both parties were responsible for particular loss, despite questionable propriety of "allocat[ing] damages in situations where specific amounts cannot be attributable to

separate causes"]; *Gateway Western Ry. v. Morrison Metalweld Process* (8th Cir. 1995) 46 F.3d 860, 862 [upholding instruction allowing contract damages to be apportioned under comparative fault principles because strict application of contract damage principles would have been overly harsh and inequitable].)

In *In re Consol. Vista Hills Litigation* (1995) 119 N.M. 542 [893 P.2d 438] (*Amrep*), the Supreme Court of New Mexico permitted an indemnity claim by a building contractor against a materials supplier even though the two were not joint tortfeasors and the sole loss in question was economic. "This situation is created, as here, when the plaintiff chooses to sue only one defendant and sues that defendant on a contract theory. Here the homeowners have sued . . . under theories of breach of contract and breach of warranty. [¶] Regardless of whether [New Mexico's contribution statute] is available for proportional contribution, in order to establish an equitable system in which all parties are held liable for damages in proportion to their respective fault, we must modify the common-law right to indemnification when an indemnitee has been adjudged liable for full damages on a third-party claim that was not susceptible under law to proration of fault among concurrent tortfeasors. Such proportional indemnification applies only when contribution or some other form of proration of fault among tortfeasors is not available." (*Id.*, 893 P.2d at pp. 448–449, fn. omitted.) "Under *Amrep*, a defendant found jointly and severally liable in contract with a right of proportional indemnity is similarly situated to a defendant jointly and severally liable in tort with a right of comparative contribution. Like a defendant jointly and severally liable in tort, a defendant liable on a contract theory continues to be responsible for 100% of the plaintiff's awarded damages. After *Amrep*, however, a defendant liable in contract may seek proportional indemnity based on principles of comparative fault in the same way a defendant jointly and severally liable in tort can seek comparative contribution." (Mock, *Trends in New Mexico Law: 1994–1995: Tort Law—New Mexico Adopts Proportional Indemnity and Clouds the Distinction Between Contract and Tort: Amrep Southwest, Inc. v. Shollenbarger Wood Treating, Inc.* (1996) 26 N.M. L.Rev. 603, 613.) As a result of *Amrep*, a "defendant can bring [into a lawsuit] virtually any other party which, within the bounds of good faith, may be potentially responsible for the third-party plaintiff's potential liability." (*Id.* at p. 615, fn. omitted.)

The advisability of apportioning damages in contract actions, however, has not been universally accepted. According to the New York Court of Appeals, "[t]he policy considerations that underlay . . . the need to liberalize the inequitable and harsh rules that once governed contribution among joint tort-feasors . . . are not pertinent to contract matters. Parties to a contract have

the power to specifically delineate the scope of their liability at the time the contract is formed. Thus, there is nothing unfair in defining a contracting party's liability by the scope of its promise as reflected by the agreement of the parties. Indeed, this is required by the very nature of contract law, where potential liability is determined in advance by the parties." (*Bd. of Educ. v. Sargent* (1987) 71 N.Y.2d 21, 29 [523 N.Y.S.2d 475, 479, 517 N.E.2d 1360, 1365]; see Bussel, *Liability for Concurrent Breach of Contract* (1995) 73 Wash.U. L.Q. 97, 124, 126·(Bussel) ["The reasons that justify the joint and several liability regime in tort in general do not apply in contract. But the disadvantages of overdeterrence and strategic behavior that give rise to criticism on the tort regime arise in contract as well. Importing the tort notions would create perverse economic incentives on prebreach behavior. And, finally, such notions appear to be inconsistent with the long-standing, well-understood and apparently well-functioning contract doctrines governing remedies"[5]].)

While this reasoning may apply to the apportionment of damages as between contracting parties, it has little application to the fairness of denying apportionment as between parties who have contributed to causing another's loss but who have no contractual relationship between themselves. Nonetheless, there are conceptual problems in imposing equitable indemnity on a party whose liability is based on breach of contract that do not exist in applying equitable indemnity between two tortfeasors. The measure of damages in most tort cases is all loss proximately caused by the wrongdoing, whether anticipated or not. However, the measure of contract damages remains very much the same as articulated in *Hadley v. Baxendale* (1884 Ex.) 156 Eng.Rep. 145—those damages that the parties could reasonably have anticipated when they entered the contract. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514–516 [28 Cal.Rptr.2d 475, 869 P.2d 454].) Thus, apportionment between parties who have breached different contracts entered at different times would in theory require the use of different measures of damages, as would apportionment as between a party liable in tort and a party liable for breach of contract. (See Bussel, *supra*, 73 Wash.U. L.Q. at pp. 124–125.) This would, at a minimum, complicate the apportionment formula.

---

[5] Bussel suggests as an alternative that courts adopt "one-party rule" under which the breaching party found to be most at fault is held liable for all damages properly awarded under its contract and other breaching parties whose conduct causes some, but less, damage are excused from all liability. "[H]olding only one concurrent breacher responsible for all the damages as calculated in accordance with its contract, and excusing the others, is superior to both joint and several liability and several liability as a solution to the problem of allocating liability for concurrent breaches." (Bussel, *supra,* 73 Wash.U. L.Q. at p. 126.)

Particularly in view of these complications, I would be reluctant to adopt a rule departing fundamentally from well-established California law on this issue. The preceding discussion suggests that the refusal to apportion damages simply because the liability of one party arises from breach of contract may warrant reconsideration. There are circumstances in which the refusal to apportion contract damages, or damages caused jointly by one party's breach of a duty imposed by law and another's breach of a contractual duty, may produce the same inequitable results that prompted our Supreme Court to abandon the all-or-nothing approach to tort damages. Yet, although there may be good reason to do so, any such fundamental change should come from our Supreme Court, or from the Legislature. Absent such a change, I agree with the majority that we must adhere to the rule that equitable indemnity may be obtained only from one who is jointly and severally liable to the injured party based on the commission of a tort, i.e., based on the breach of a duty imposed by law.

    c.   *BTMG's Alleged Failure to Timely Perform Constitutes the Breach of a Duty Imposed by Law for the Purpose of Granting Equitable Indemnity*

Proceeding on the premise that Stop Loss can state a claim for indemnity against BTMG only if it can allege facts establishing a tort liability of BTMG, two alternatives suggest themselves. Stop Loss may be entitled to equitable indemnity if BTMG breached a duty to the Regents imposed by law that contributed to the Regents' loss for which Stop Loss may be held responsible. Stop Loss also may be entitled to recover from BTMG if BTMG breached a duty imposed by law that is owed to Stop Loss.

As indicated in part II.2.a. above, BTMG could have acquired a duty to the Regents to timely process claims information only by having agreed explicitly or implicitly to do so. Although its failure to perform such a duty may have constituted the breach of a contractually based obligation, the failure may in addition have breached a duty imposed by law. In *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774 [69 Cal.Rptr.2d 466], the court explained that "for over 50 years California has also recognized the fundamental principle that ' "[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract." The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill and knowledge; the obligation is

implied by law and need not be stated in the agreement [citation].' [Citations.] . . . A contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner. A negligent failure to do so may be both a breach of contract and a tort. [Citation.] In such a hybrid circumstance, the plaintiff is entitled to pursue both legal theories until an occasion for an election of remedies arises." (*Ibid.*, fn. omitted; see also *Eads v. Marks* (1952) 39 Cal.2d 807, 810 [249 P.2d 257] ["Even where there is a contractual relationship between the parties, a cause of action in tort may sometimes arise out of the negligent manner in which the contractual duty is performed"].)[6]

BTMG argues that the decision of the Supreme Court in *Aas v. Superior Court* (2000) 24 Cal.4th 627 [101 Cal.Rptr.2d 718, 12 P.3d 1125] (*Aas*), superseded by statute on another ground as set out in *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1079–1080 [135 Cal.Rptr.2d 361, 70 P.3d 351], precludes the recognition of a "broad general duty of care" that would support tort liability here. In holding that homeowners cannot recover for construction defects that have not caused personal injury or property damage, the court in *Aas* stated that "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, ' "[c]ourts will generally enforce the breach of contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." ' " (*Aas, supra,* at p. 643; see *Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 [87 Cal.Rptr.2d 886, 981 P.2d 978] (*Erlich*).) Relying on *Aas,* the court in *BFGC, supra,* 119 Cal.App.4th at page 853, rejected an architect's claim for equitable indemnity against the contractors on the job in question, reasoning that "[t]he only allegations of [the contractors'] misconduct are based on their alleged breach of contract, despite [the architect's] gloss that in doing so they breached their duties. This is an improper attempt to recast a breach of

---

[6] The recognition of this principle in California can be traced at least to the 1942 decision in *Roscoe Moss Co. v. Jenkins* (1942) 55 Cal.App.2d 369 [130 P.2d 477]. In that case, a contractor sued a property owner for breach of contract after the owner failed to pay for a well that the contractor dug on the owner's ranch. The property owner asserted that the contractor failed to dig the well in a good and workmanlike manner. The court upheld a cross-complaint against the contractor asserting a cause of action for breach of the duty implied by law applicable to every contract for services. (*Id.* at pp. 376–377; see also *Kuitems v. Covell* (1951) 104 Cal.App.2d 482, 485 [231 P.2d 552] [statement in written roofing contract that contract contains the entire agreement of the parties does not preclude claim based on breach of the duty implied in all contracts that the work be performed "with care, skill, reasonable expedience, and faithfulness the thing agreed to be done"]; see also cases cited in fns. 7 & 8, *post.*)

contract cause of action as a tort claim." The majority opinion here echoes this reasoning.

The line of cases exemplified by *Aas* and *Erlich*, however, does not preclude a claim for equitable indemnity under the present circumstances. In *Aas*, the Supreme Court held that the so-called "economic loss rule" precludes recovery under tort theories for losses that are solely economic, and that recovery for such losses normally can be obtained only to the extent available for breach of contract or warranty. (*Aas, supra,* 24 Cal.4th at pp. 635–636.) The *Aas* court reaffirmed its rejection in *Erlich* of "the argument that the negligent performance of a construction contract, without more, justifies an award of tort damages." (*Id.* at p. 643.) And, after analyzing the factors identified in *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16] and reaffirmed in *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60] (*J'Aire*), the court did "not find they justify a broad rule permitting recovery of repair costs unaccompanied by property damage or personal injury." (*Aas, supra,* 24 Cal.4th at p. 647.)

The "economic loss rule" applied in *Aas* "requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 988 [22 Cal.Rptr.3d 352, 102 P.3d 268] (*Robinson Helicopter*); see also *Aas, supra,* 24 Cal.4th at p. 643; *Seely v. White Motor Co.* (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145].) The rationale for this rule was repeated in *Robinson Helicopter*: " ' "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." [Citation.] We concluded that the nature of this responsibility meant that a manufacturer could appropriately be held liable for physical injuries (including both personal injury and damage to property other than the product itself), regardless of the terms of any warranty. [Citation.] But the manufacturer could not be held liable for "the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." ' " (*Robinson Helicopter, supra,* 34 Cal.4th at pp. 988–989.)

The recovery of tort damages for a breach of contract is seldom permitted. "Generally, outside the insurance context, 'a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common

law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.' " (*Erlich, supra,* 21 Cal.4th at pp. 553–554; see 1 Witkin, Summary of California Law (10th ed. 2005) Contracts, § 877, p. 965.) Our Supreme Court has repeatedly emphasized that "[c]ontract and tort are different branches of the law," and that "[c]ontract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise. [¶] In contrast, tort damages are awarded to compensate the victim for injury suffered." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at pp. 514, 515–516; see *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373]; *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85 [44 Cal.Rptr.2d 420, 900 P.2d 669] [overruling *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], which had recognized cause of action in tort for bad faith denial of the existence of a contract].)

In *Erlich,* the Supreme Court confirmed that " 'the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts.' " (*Erlich, supra,* 21 Cal.4th at p. 551.) But the court adhered to the rule that tort damages cannot be recovered if the act is wrongful only because it breaches a contractual obligation, holding that emotional distress damages cannot be recovered for the breach of a contract to construct a house. The court reaffirmed that "damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract in California" (*id.* at p. 558), summarizing the reasons for denying tort recovery in contract breach cases as follows: "the different objectives underlying tort and contract breach; the importance of predictability in assuring commercial stability in contractual dealings; the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and the preference for legislative action in affording appropriate remedies. [Citation.] . . . Restrictions on contract remedies serve to protect the ' "freedom to bargain over special risks and [to] promote contract formation by limiting liability to the value of the promise." ' " (*Id.* at p. 553.)

As appears, the issue with which all of these cases grapple is the type of damages that may be recovered under contract and tort principles. Despite the fact that a negligent failure to perform contractual obligations constitutes a tort, the injured party may recover only contractual damages unless "the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." (*Erlich, supra,* 21 Cal.4th at p. 552; see *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at p. 515.) Stated differently, unless " 'the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.' " (*Erlich, supra,* at p. 552.) The restriction is grounded in the recognition that "the consequences of a negligent act must be limited to avoid an intolerable burden on society." (*Ibid.*)[7]

These reasons for adhering to the distinction between damages recoverable in contract and in tort have no bearing on the present claim for equitable indemnity. Stop Loss is not attempting to recover expanded tort damages or any element of damages not customarily available for breach of contract. The Regents' claim against Stop Loss seeks only economic damages—a remedy available for a breach of the Regents/Stop Loss agreement—and Stop Loss seeks only to compel BTMG to pay for its proportionate contribution to the Regents' loss—damages that would also be available for breach of agreement between the Regents and BTMG. By recognizing that BTMG's alleged breach of a commitment to the Regents may also violate a duty imposed by law and thus support a claim for equitable indemnity, BTMG is not exposed to liability beyond that which was foreseeable when it made a commitment to the Regents. Requiring BTMG to pay for the share of the Regents' loss for which it is responsible will not interfere with the reasonable expectations of BTMG, expand the scope of damages for breach of contract, or expose BTMG to unlimited liability.[8] In simply reiterating the principle that a party

---

[7] In *Butler-Rupp v. Lourdeaux* (2005) 134 Cal.App.4th 1220, 1228–1229 [36 Cal.Rptr.3d 685], the court recently reaffirmed that damages recoverable for the negligent performance of a contract are limited by the reasonable expectations of the parties. "Our consideration of the *Erlich* decision and related lines of authority leads to the conclusion that the award of damages for emotional distress should be reversed. The record supports a finding only that defendants negligently performed their contractual duties under the lease, thereby incurring liability for breach of contract. . . . The Lourdeauxs' duties were circumscribed by their obligations under the lease and were confined to fulfilling plaintiff's contractual expectations of economic gain. The damages are therefore predicated on economic injury to plaintiff, which precludes recovery of damages for emotional distress. In our view, the affirmance of the award of damages for emotional distress would blur the distinction between contract and tort, thereby violating the policy underlying the economic loss rule. Since Butler-Rupp's damages derive solely from appellants' failure to perform their contract obligations, she can recover only in contract for the economic losses due to her disappointed contractual expectations." (*Id.* at p. 1229.)

[8] Another situation in which a negligent breach of contract is treated as also being tortious, which does not have the effect of expanding the measure of damages for the breach, is in the

may not ordinarily recover in tort for the breach of contractual duties (maj. opn., *ante*, at p. 1041), the majority opinion ignores the context in which this principle has invariably been applied, the reasoning behind the principle—to prevent the recovery of damages not within the reasonable expectations of the parties in entering the contract—and the fact that recognizing a claim for indemnity in the present context would not sanction the recovery of any damages that are not contract damages.[9]

Nor will permitting equitable indemnity in this situation violate the so-called economic loss rule. The indemnitor cannot be liable for negligent breach of contract unless it has in fact breached the contract. Holding the

---

application of the delayed discovery rule to toll the statute of limitations. Generally, the delayed discovery rule applies only to actions sounding in tort. (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 830, 832 [195 Cal.Rptr. 421].) Nonetheless, the delayed discovery rule has been applied consistently in negligent breach of contract cases. In *Allred v. Bekins Wide World Van Services* (1975) 45 Cal.App.3d 984 [120 Cal.Rptr. 312], the court applied the delayed discovery rule to a breach of contract claim based on breach of the duty of care implied by law in all contracts for the performance of services. The court reasoned, "The purpose of Bekins' contract with the employers was the delivery of the Allred family's goods to their home in the United States. In this undertaking Bekins was bound, as a matter of law, to use at least reasonable care and skill. [Citations.] And: ' "[N]egligent failure to observe [such] conditions is a tort, as well as a breach of the contract." ' " (*Id.* at p. 989.) The court concluded that because the Allreds had sufficiently pled a "negligent violation of a legal duty" the "applicable statutes of limitations in the case at bench, were tolled until the Allreds sustained damage, *and* discovered or should have discovered, their cause of action against Bekins." (*Id.* at pp. 989, 991; see also *Seelenfreund v. Terminix of Northern Cal., Inc.* (1978) 84 Cal.App.3d 133, 136–139 [148 Cal.Rptr. 307] [delayed discovery rule applied to claim alleging negligent breach of contract to conduct termite inspection].) By acknowledging that the Allreds' claim sounded in both contract and tort, the court did not expand Bekins's liability or interfere with Bekins's reasonable expectations under the contract.

[9] Indeed, the majority acknowledges that "the policy reasons courts have resisted expanded tort liability do not apply in the context of equitable indemnity." (Maj. opn., *ante*, at p. 1044.) The majority finds it "hard to see why a tortfeasor [i.e., in this case, Stop Loss] should receive the windfall of an equitable set-off when the law precludes the injured party from recovering tort damages for the same wrongful conduct." (*Id.* at p. 1044.) But of course we are not dealing with a "windfall" but with the apportionment of liability as between two parties who have contributed to the same loss. The majority fails to explain why the policy of prohibiting tort damages, which (contrary to the maj. opn., *ante*, at p. 1044, fn. 4) are not at issue here, provides any rational explanation for precluding the recovery of contract damages by way of indemnity. The majority asks rhetorically, as if there were no good answer: "Why should the law favor the wrongdoer with a more advantageous measure of damages?" (*Id.* at p. 1044.) The reason of course is the same as the reason for which our Supreme Court has recognized equitable indemnity in the first place. (See *ante*, at pp. 1043–1044.) To repeat the answer of Dean Prosser: because " '[t]here is obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were . . . unintentionally responsible, to be shouldered onto one alone, . . . while the latter goes scot free.' " (*American Motorcycle Assn. v. Superior Court, supra,* 20 Cal.3d at pp. 607–608.)

indemnitor responsible for its proportionate share of the injured party's financial loss does not impose any liability beyond that which it has contractually assumed.

Moreover, in *Aas*, the Supreme Court reaffirmed that in some circumstances economic damages may be recoverable for the negligent performance of a contractual obligation damaging the economic interests of a third party. Liability to one not in privity may be imposed if a balancing of the factors identified in *Biakanja v. Irving, supra*, 49 Cal.2d at page 650, and reaffirmed in *J'Aire, supra*, 24 Cal.3d at page 804, warrant the imposition of a duty to protect those interests. (*Aas, supra*, 24 Cal.4th at pp. 643–644.) In *J'Aire*, the court held that "[w]here a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." (*J'Aire, supra*, 24 Cal.3d at p. 804.)[10] In determining the existence of a special relationship giving rise to a duty of care, the following factors should be weighed: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." (*J'Aire*, at p. 804.)

Here, the allegations of Stop Loss's cross-complaint satisfy most of the *J'Aire* factors. The understanding allegedly reached between the Regents, BTMG and Stop Loss was intended to affect the Regents' ability to obtain insurance coverage and Stop Loss's ability to perform its responsibilities under that arrangement. The harm allegedly caused by BTMG's failure to timely process the claim data was entirely foreseeable. BTMG's alleged failure to perform is closely connected to the denial of the insurance coverage and the harm suffered by the Regents, and in turn to the loss sustained by Stop Loss in incurring liability for the loss of that coverage. While there is not necessarily any moral blame attached to BTMG's conduct, recognizing a duty owed to Stop Loss for this purpose may well decrease the likelihood of similar harm in the future. The preponderance of the *J'Aire* factors thus supports finding a special relationship in this case which justifies the recognition of a duty on the part of BTMG owed to Stop Loss to perform its

---

[10] In *North American Chemical. v. Superior Court, supra*, 59 Cal.App.4th at page 783, the court noted that "[s]ubsequent cases have extended the application of *J'Aire* to cases where the parties are in contractual privity. [Citations.] . . . '[T]he reasoning of *J'Aire* is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity.' "

commitments to the Regents. (See *Aas, supra*, 24 Cal.4th at p. 644 ["case-by-case test for identifying such a duty" involves balancing the factors set forth in *J'Aire*].)[11]

Treating the negligent breach of a contractual obligation as sufficient to support a claim for equitable indemnity does not render nugatory the conclusion that such indemnity is available only between joint tortfeasors. Every breach of contract will not support a claim for indemnity but only those that result from a failure "to perform with care, skill, reasonable expedience, and faithfulness." (*North American Chemical v. Superior Court, supra*, 59 Cal.App.4th at p. 774.) This differs from the strict liability that is imposed for any unexcused failure to perform the terms of a contract. (*Bruckman v. Parliament Escrow Corp., supra*, 190 Cal.App.3d at p. 1063.)[12]

I thus reach the same conclusion as did the Supreme Court of New Mexico in *Amrep, supra*, 893 P.2d at page 447: "Although a person cannot be held liable for economic-loss damages in tort because of the economic-loss rule, when that person is held liable for economic-loss damages in contract, and that person's liability is attributable to the fault of another, it would be unjust not to allow indemnification. We therefore hold that the economic-loss rule does not bar a claim for indemnification. If a party is held liable for damages that are the fault of another, the former may seek indemnification from the latter regardless of the basis for the former's liability. This does not abrogate the economic-loss rule because parties are still bound by their contractual

---

[11] With all respect, the majority's disagreement with this conclusion is inexplicable. (Maj. opn., *ante*, at p. 1042.) The majority states, "*Biakanja* and *J'Aire* address the specific situation that arises when (1) the defendant was acting pursuant to a contract, and (2) the defendant's negligent performance of the contract injures a third party." (*Ibid.*) Though asserting that "[n]either of these prerequisites is met in this case" (*ibid.*), both plainly are. Cross-defendant— i.e., BTMG—we must assume was acting pursuant to an implied agreement with the Regents, and its alleged negligent performance has injured a third party, namely Stop Loss, who we must assume will be held liable for the portion of the Regents' loss caused by BTMG. The response of the majority (maj. opn., *ante*, at p. 1042, fn. 3) incorrectly assumes, without authority or explanation, that *Biakanja* and *J'Aire* apply only if the third party was directly injured by the defendant's conduct and was not partially at fault for the loss. However, the *J'Aire* factors do not limit recovery to those directly injured but require consideration of the foreseeability of the harm and the closeness of the connection between the defendant's conduct and the harm suffered. Proper application of these factors does not expand liability beyond that which is contemplated in *J'Aire* and *Biakanja*. Moreover, nothing in *J'Aire* and *Biakanja* suggests that the third party's comparative fault precludes any recovery under the test enunciated in those cases.

[12] It may be that the considerations on which the right to equitable indemnity is based would support extending the remedy to any breach of contract, but this conclusion cannot be derived from the principles articulated in *North American Chemical v. Superior Court, supra*, 59 Cal.App.4th 764, and I express no opinion on this issue. Similarly, I express no opinion as to the availability of equitable indemnity from a party whose liability is based on negligent breach of contract if the damages of the injured party include emotional distress or other elements not recoverable for breach of contract.

agreements (including indemnification agreements) and because allowing indemnification in this context would in no way blur the line between contract and tort." (Fn. omitted.)

3. *Reversal is not required because of subsequent developments in this case.*

Despite my conclusion that Stop Loss sufficiently alleged a cause of action for equitable indemnity, so that the demurrer to the cross-complaint should not have been sustained, for reasons arising subsequent to the trial court's ruling it is not necessary to reverse the dismissal of the cross-complaint. BTMG states in its brief, "Any alleged negligence on the part of BTMG may be imputed to the Regents." At oral argument counsel for BTMG reiterated that BTMG was at all times acting as an "agent," "middleman" or "manager" for the Regents and thus that any conduct on BTMG's part that contributed to the Regents' loss would be attributed to the Regents. The pleadings out of which this appeal arises provide no basis to assume that the Regents would agree or would be compelled to accept responsibility for deficiencies in the performance of BTMG. Nonetheless, the Regents' claim against Stop Loss has already been tried and, as BTMG has represented, Stop Loss was held liable only for that portion of the Regents' loss which the jury attributed directly to Stop Loss.

While this appeal was pending, the Regents' action against Stop Loss was tried before a jury.[13] The jury rejected the Regents' breach of contract claim, finding that the Regents did not "do all, or substantially all, of the significant things that the contract required them to do." However, the jury did find Stop Loss liable for "professional negligence in connection with the placement of Provide Excess insurance." The jury was instructed to apportion fault between the Regents and Stop Loss if it determined that any negligence on the part of the Regents contributed to the Regents' harm, and the jury awarded the Regents only $569,400 in damages, significantly less than the amount of the insurance recovery the Regents claimed was lost as a result of the late claim submission. Since there has been no suggestion that there was any fault on the part of the Regents other than that for which BTMG was responsible, it appears that the underlying action was tried consistent with BTMG's representation that Stop Loss would be liable for only that portion of the loss attributable to its own fault, and that the Regents' recovery was reduced by the portion of fault the jury attributed to BTMG. Since Stop Loss was not

---

[13] The "Judgment on Special Verdict" entered on June 8, 2006, in *Regents of the University of California v. Stop Loss Ins. Brokers, Inc.* (Super. Ct. S.F. City and County, 2006, No. CGC-03-425164) and the jury instructions on which the case was submitted to the jury are subject to judicial notice on the court's own motion under Evidence Code section 452, subdivision (d).

held liable for any portion of the loss attributable to BTMG's fault, there is no basis for a claim of indemnity. (See *Jaffe v. Huxley Architecture* (1988) 200 Cal.App.3d 1188, 1192 [246 Cal.Rptr. 432] ["Since indemnification is an equitable doctrine existing only to correct potential injustice, it has no utility where there is no such potential"].) Hence, there is no need or justification for reversing the ruling that the court made with respect to the pleadings because subsequent developments in the litigation have rendered the question moot.