Filed 3/19/26  Seeley v. Urwell Diversified Holdings CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KENNETH R. SEELEY et al., | D082547 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. PSC1802622) |
| URWELL DIVERSIFIED HOLDINGS, INC., et al., | |
| Defendants and Respondents; | ORDER MODIFYING OPINION AND DENYING REHEARING |
| INTEGRITY ESCROW et al, | |
| Defendants and Appellants. | **[CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed on February 27, 2026 be modified as follows:

1.      On page 7, line 1, the sentence beginning with "As of the date" and ending with "pending against Integrity" is modified as follows:

> As of the date the bench trial commenced, nine claims (not including the unlawful detainer claims) remained pending between plaintiffs and Cardenas, two claims remained pending against Franklin, six claims remained pending against both escrow defendants, and one additional claim remained pending against Integrity.

2. On page 7, line 5, the sentence beginning with "The five remaining" and ending with "amended cross-complaint" is modified as follows, including the addition of footnote 8, which will require renumbering of all subsequent footnotes:

> The nine remaining claims between plaintiffs and Cardenas were: claims for quiet title and cancellation of instruments pleaded by plaintiffs in their fourth amended complaint; and cross-claims for quiet title, waste, ejectment, nuisance, equitable indemnity, and equitable subrogation[1] pleaded by Cardenas in its second amended cross-complaint.

3. On page 9, line 1, the sentence beginning with "Regarding the claims" and ending with "waste and ejectment" is modified as follows, including the addition of footnote 11:

> Regarding the claims between plaintiffs and Cardenas, the court quieted title to all three properties in Cardenas, it adjudicated the cancellation of instruments claim and the waste and ejectment cross-claims in Cardenas's favor, it awarded Cardenas $1.2 million in damages against the sellers for waste and ejectment, it adjudicated the negligence cross-claim in plaintiffs' favor, it concluded that the equitable indemnity and equitable subrogation cross-claims were rendered moot inasmuch as no damages were awarded against Cardenas,[11] and it concluded that the nuisance cross-claim was rendered moot by the adjudication of the ejectment claim.

---

[1] The cross-claim for equitable subrogation was pleaded only against the sellers (i.e., not Intervention911).

[11] The trial court also concluded that equitable cross-claims Cardenas had pleaded exclusively against the buyer defendants—seeking (1) declaratory relief, (2) apportionment of liability, and (3) comparative implied indemnity and contribution—were moot.

2

4.      On page 10, footnote 10, the last sentence beginning with "The trial court" and ending with "the escrow defendants" is modified as follows:

> The trial court found that these instructions were the only instructions the sellers provided to the escrow defendants.

5.      On page 23, footnote 21, the last sentence beginning with "As discussed *ante*" and ending in "such an argument" is modified as follows:

> As discussed *post*, the plaintiffs' non-delivery argument is such an argument.

6.      On page 26, line 12, the sentence beginning with "(See *Estate of Jones*" and ending with "delivery or not" is modified to add footnote 25 as follows:

> (See *Estate of Jones* (2022) 82 Cal.App.5th 948, 953 ["In the absence of extrinsic evidence, . . . interpreting a contract is a matter of law subject to de novo review"]; *Osborn v. Osborn* (1954) 42 Cal.2d 358, 363–364 [holding, in a case involving seller escrow instructions expressed exclusively in writing, that, because "[d]elivery is a question of intent," it is " 'a pure question of law whether there was an absolute delivery or not' "[25]].)

---

[25]      At oral argument and in a petition for rehearing, Cardenas argues that delivery in this case was not a pure question of law because it implicated a factual dispute. In support of this argument, Cardenas points to an e-mail one of the sellers sent to the escrow defendants on the day escrow was projected to close, saying, "We are all set to record the sale," arguing that this e-mail and testimony pertaining to it could be interpreted as a waiver of the condition that there be no financing apart from seller financing in the real estate transactions. But we do not perceive in this e-mail, or in any other aspect of the evidence to which our attention has been drawn, any basis on which to conclude that *the sellers' intentions or instructions with respect to financing changed* between the time they signed the purchase and sale agreements that included the escrow instructions and the time that escrow purportedly closed.

7.     On page 27, line 7, the sentence beginning with "This being the case" and ending with "ejectment claims" is modified as follows:

> This being the case, the judgment must be reversed insofar as it:  (1) adjudicates the sellers' quiet title and cancellation of instruments claims in favor of Cardenas and against the sellers, (2) quiets title to the properties in Cardenas, (3) adjudicates Cardenas's waste and ejectment cross-claims in favor of Cardenas and against the sellers, (4) awards Cardenas damages on the waste and ejectment cross-claims, and (5) concludes Cardenas's cross-claims for equitable indemnity, equitable subrogation, apportionment of liability, and comparative implied indemnity and contribution are moot.

8.     On page 40, line 14, the sentence beginning with "Specifically: We reverse" and ending with "the escrow defendants" is modified as follows:

> Specifically, we reverse the portions of the judgment: (1) adjudicating the sellers' quiet title and cancellation of instruments claims in favor of Cardenas and against the sellers; (2) quieting title to the properties in Cardenas; (3) adjudicating Cardenas's waste and ejectment claims in favor of Cardenas and against the sellers; (4) awarding Cardenas damages on the waste and ejectment claims; (5) concluding Cardenas's cross-claims for equitable indemnity, equitable subrogation, apportionment of liability, and comparative implied indemnity and contribution are moot; (6) finding in favor of Franklin on the claim that it aided and abetted the escrow defendants' breaches of fiduciary duties; and (7) awarding plaintiffs damages and prejudgment interest against the escrow defendants.

9.     On page 40, line 23, the sentence beginning with "We remand the matter" and ending on page 41, line 9 with "the escrow defendants" will begin a new paragraph, add new footnote 35 and is modified as follows:

> We remand the matter to the trial court with instructions: (1) to enter judgment on remand (a) quieting title in fee simple to the properties in the sellers as against Zenith and

Cardenas, free and clear of any claimed interests by Zenith or Cardenas, as of September 28, 2017,[34] and (b) cancelling the Cardenas deeds of trust and the trustee deeds; and (2) to consider (a) Cardenas's cross-claim for equitable indemnity against plaintiffs, its cross-claim for equitable subrogation against the sellers, and its cross-claims for apportionment of liability and for comparative implied indemnity and contribution against the buyers,[35] (b) the sellers' quiet title claim as pleaded against Sabahi,[36] (c) plaintiffs' claim against Franklin for aiding and abetting the escrow defendants' breaches of fiduciary duties, (d) the escrow defendants' failure-to-mitigate-damages defense, (e) whether and to what extent the award of damages against the escrow defendants should be eliminated or modified as a result of quieting title to the properties in the sellers, and (f) whether and, if so, in what amount, prejudgment interest should be awarded to the sellers for their breach of contract claim against the escrow defendants.

This modification changes the judgment.

The petitions for rehearing are denied.

O'ROURKE, Acting P. J.

---

[34] We express no opinion as to effects that the quieting of title in the sellers as against Zenith and Cardenas may have with respect to the right, title, or interest of any *other* person in or to any of the properties.

[35] We express no opinion as to the merits of these four claims; however, we note the statement in paragraph 148 of the fourth amended complaint) that "plaintiffs are ready and willing to pay the amount of the Loan Payoffs to Cardenas, as an equitable matter, as this would put them in the same position as prior to the transactions."

[36] See fn. 27 *ante*.

Filed 2/27/26  Seeley v. Urwell Diversified Holdings CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KENNETH R. SEELEY et al., | D082547 |
| Plaintiffs and Appellants, | |
| v. | |
| URWELL DIVERSIFIED HOLDINGS, INC., et al., | (Super. Ct. No. PSC1802622) |
| Defendants and Respondents; | |
| INTEGRITY ESCROW et al, | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Riverside County, Manuel Bustamante, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

Apex Law, Thomas N. FitzGibbon; Ferguson Case Orr Paterson and Wendy C. Lascher for Plaintiffs and Appellants, Kenneth R. Seeley, Eric McLaughlin and Intervention911.

Meylan Davitt Jain Arevian & Kim and D. Damon Willens for Defendant and Respondent, Cardenas Three.

Wood, Smith, Henning & Berman and Steven R. Disharoon for Defendants, Respondents and Cross-Appellants, Integrity Escrow and Shu Luu Hoang.

Fransen and Molinaro and Nathan Fransen for Defendant and Respondent, Franklin Advantage, Inc.

Kenneth R. Seeley, Eric McLaughlin, and Intervention911 (collectively, plaintiffs) appeal a judgment following a bench trial that involved competing claims between them and Cardenas Three (Cardenas) pertaining to real estate sale transactions in connection with which the buyers had fraudulently accepted loans from Seeley and McLaughlin and from Cardenas. The judgment:

– Awarded plaintiffs and Cardenas damages against the buyers;

– Awarded plaintiffs damages against the escrow holder and escrow officer—Integrity Escrow (Integrity) and Shu Luu Hoang—involved in the real estate transactions (the escrow defendants);

– Awarded Cardenas damages against plaintiffs; and

– Quieted title to the subject properties in Cardenas.

On appeal, plaintiffs contend the trial court erred: (1) in denying them a jury trial; (2) in concluding Cardenas had rights in the properties that were superior to theirs; (3) in awarding damages against them; (4) in not canceling Cardenas's security interests in the properties that were the subject of the real estate transactions; and (5) in concluding that Franklin Advantage, Inc. (Franklin), a loan broker that had assisted Cardenas, had not aided and abetted a breach of the escrow defendants' fiduciary duty to them.

The escrow defendants appeal the judgment, too. They contend the trial court erred: (1) in not determining that fraud on the part of the buyers was an intervening cause absolving the escrow defendants of liability; (2) in not adjudicating their comparative-fault and failure-to-mitigate-damages defenses; and (3) in awarding prejudgment interest against them.

2

We agree with some but not all of these contentions. Thus we affirm in part, reverse in part, and remand the matter to the trial court for further proceedings.

## I.  BACKGROUND

This case revolves around sales of three Palm Springs area properties. In 2017, Intervention911 was operating the properties as detox, sober living, and residential recovery facilities, when its owners—Seeley and McLaughlin—were approached by Urwell Diversified Holdings, Inc. (Urwell) with proposals to purchase both Intervention 911 and the properties. Negotiations resulted in Seeley and McLaughlin (the sellers) and Urwell entering into two different sets of transactions—one pertaining to the three properties (the real estate sale transactions) and the other pertaining to Intervention911 (the business sale transactions).

### A.  The Real Estate Sale Transactions

With regard to the real estate sale transactions, the sellers agreed to Urwell's proposal that each of the three sales be financed with a loan by the sellers in what is commonly referred to as seller financing or a carryback loan. In addition, though Urwell initially proposed that the carryback loans be secured by the lien of a deed of trust in *second* priority position, it and the sellers ended up agreeing that each of these loans instead would be secured in *first* priority position.

To effectuate the real estate sale transactions, Urwell and the sellers executed three real estate sale contracts—one for each of the three properties—using California Association of Realtors (CAR) forms, with the fields filled in to reflect the terms to which the parties had agreed. Among these forms were: a template entitled "Commercial Property Purchase Agreement and Joint Escrow Instructions" (the CAR commercial sale template); a template entitled "Residential Purchase Agreement and Joint

3

Escrow Instructions" (the CAR residential sale template); and a template entitled "Seller Financing Addendum and Disclosure" (the CAR seller financing addendum template).[2]

In keeping with the agreements discussed *ante*, the fields in these templates that were to be filled in for transactions involving "[s]eller financing" were populated with an ⊠ signifying there would be seller financing, and with the carryback loan amount and interest rate corresponding to each transaction, and the fields that were to be filled in for transactions involving any additional financing[3]—including "loans and/or encumbrances that will be senior to [s]eller financing"—were left blank, signifying that there was to be no other financing and that the carryback loans were to be secured by the lien of a deed of trust recorded in first priority position.

As can be seen, the terms of the real estate sale contracts provided for there to be no financing in the real estate sale transactions other than the seller financing, and no encumbrances senior to the seller deeds of trust that were to be recorded in connection with that financing. But these terms notwithstanding, Urwell—without informing plaintiffs—also arranged to borrow funds for each of these transactions from *another* lender and agreed with *that* lender—Cardenas—that each of *its* loans would be secured by the lien of a deed of trust recorded in first priority position. This resulted in

---

[2]     The CAR commercial sale template was used for two of the real estate sale transactions, the CAR residential sale template was used for the other real estate transaction, and the CAR seller financing addendum template was used for all three of these transactions.

[3]     These fields corresponded to sections of the form labeled "second loan," "senior loans and encumbrances," and "junior financing;" however, as noted *post*, the boxes remained unchecked and the fields were left blank.

there being two conflicting sets of escrow instructions (one from the buyers and sellers and one from Cardenas) and in there being loan proceeds in excess of the amounts needed to close each sale.[4]

Although escrow instructions for both sets of transactions were accepted by one single escrow holder—Integrity—and handled in one single escrow, no one at Integrity sought further instructions to resolve the clash between the two competing sets of escrow instructions. Instead Integrity simply (1) arranged for recordation of grant deeds to the three properties identifying Urwell's designee—Zenith Homes, LLC (Zenith)—as the grantee, (2) remitted the excess funds to Zenith,[5] and (3) (through the escrow officer's instructions to the title company) permitted the Cardenas deeds of trust to be recorded in first priority position, ahead of the seller deeds of trust.

It was not until 10 weeks after the Cardenas deeds of trust had recorded that plaintiffs learned the seller deeds of trusts had not been recorded in first priority position. A few months after plaintiffs became aware of this fact, the buyers defaulted on all six loans,[6] leaving the sellers

---

[4] Viewing the three real estate sale transactions in the aggregate: the sale prices totaled $4,700,000; the carryback loans totaled $2,580,400; and the Cardenas loans totaled $3,055,000. The difference between the sum of the loans and the sum of the sale prices was $935,400. Reducing this amount by closing costs and other fees yielded excess loan proceeds totaling $785,000.

[5] The party that signed the three real estate contracts as "buyer" was Urwell. However, Urwell and the sellers agreed that Urwell could assign the role of buyer to another party; and the party that ended up taking title to the three properties in place of Urwell when the transaction closed was Zenith. For the sake of simplicity, we refer throughout this opinion to Urwell, Zenith, and persons associated with them as "the buyers" or "the buyer defendants."

[6] The business sale transactions also did not turn out well.

and Cardenas pointing fingers at the buyers, at the escrow defendants, and at one another.

## B.  The Litigation and Foreclosures

The events described *ante* led to the sellers retaking or retaining possession of the properties and, in 2018, to their initiating the present action with the filing of a complaint against the buyer defendants, the escrow defendants, Cardenas, Franklin, and others.  During the pendency of the action, Cardenas acquired deeds to the three properties (trustee deeds) through foreclosure and trustee's sales, thereby seemingly extinguishing the sellers' interests in the properties.[7]  But Intervention911 continued in possession of the properties instead of relinquishing them to Cardenas.

Deprived of possession of the three properties, Cardenas filed a cross-complaint against the buyer defendants and plaintiffs in the present action and initiated three new actions (one for each of the properties)—each seeking unlawful detainer relief against Intervention911.

The unlawful detainer actions were consolidated into the present action.  But as trial approached, the trial judge (Judge Bustamante), over plaintiffs' objections, (1) bifurcated the action to separate the trial of the unlawful detainer claims from the trial of the non-unlawful detainer claims, (2) ruled that the non-unlawful detainer claims would be tried first, and (3) further ruled that the trial of the non-unlawful detainer claims would be a bench trial.

As of the date the bench trial commenced, five claims (not including the unlawful detainer claims) remained pending between plaintiffs and

---

[7]    Cardenas represents that, following entry of judgment, it sold two of the three properties.  It has filed a request for judicial notice of two deeds that it says pertain to these sales.  The request is denied.

Cardenas, two claims remained pending against Franklin, six claims remained pending against both escrow defendants, and one additional claim remained pending against Integrity.[8] The five remaining claims between plaintiffs and Cardenas were: claims for quiet title and cancellation of instruments pleaded by plaintiffs in their fourth amended complaint; and claims for quiet title, waste, and ejectment pleaded by Cardenas in its second amended cross-complaint.[9] The two remaining claims against Franklin were a claim for aiding and abetting fraud and breach of fiduciary duty and a claim for violation of Business & Professions Code section 17200. The six remaining claims against the two escrow defendants were claims for: negligence; negligence per se; breach of fiduciary duty; fraud; violation of Penal Code section 496; and violation of Business & Professions Code section 17200. The additional remaining claim against Integrity was for breach of contract.

Twenty witnesses testified at trial over the course of 17 days during 2023. On the twelfth day of trial, shortly after plaintiffs had rested their case, Franklin moved pursuant to Code of Civil Procedure section 631.8 for judgment in its favor. During the hearing that ensued, the trial judge

---

[8]    Some of these claims, along with other claims, also remained pending against the buyer defendants. All of the buyer defendants other than Urwell were defaulted before trial, and Urwell's operative answer was stricken by order of the trial court on the first day of trial, shortly before opening statements. Consequently, none of the buyer defendants participated in the trial.

[9]    The claim for ejectment was to recover possession of the properties, along with damages incurred as a result of being out of possession. The claim for waste was to recover damages associated with allegations that the sellers had permitted the properties to fall into disrepair.

indicated he was inclined to grant the motion, and he subsequently did grant the motion.

Following the hearing on Franklin's motion, the trial continued with Cardenas's and the escrow defendants' presentations of their cases. Then, at the conclusion of the trial, the judge issued an initial statement of decision and, following further proceedings, a final statement of decision and then a judgment. In the final statement of decision, the judge concluded that the sellers and Cardenas had been defrauded by the buyer defendants, that none of the other parties had participated in the fraud, and that the escrow defendants had failed to live up to their obligations to the sellers.

More specifically, regarding the claims against the buyer defendants, the court found: that the buyer defendants had breached the three real estate sale contracts and a settlement agreement pertaining to the business sale transactions; that they had defrauded plaintiffs in connection with the real estate sale transactions and the business sale transactions; that they had defrauded Cardenas in connection with its loan transactions; and that they had violated Penal Code section 496.

Based on these findings, the court awarded, in favor of plaintiffs and against the buyer defendants, compensatory and punitive damages totaling $10,026,200 plus additional amounts for prejudgment interest and attorneys' fees; and it awarded, in favor of Cardenas and against the buyer defendants, $3,055,000 in compensatory damages.[10]

Regarding the claims between plaintiffs and Cardenas, the court quieted title to all three properties in Cardenas, it adjudicated the cancellation of instruments, waste, and ejectment claims in Cardenas's favor,

---

[10]    No buyer defendant has appealed the judgment.

8

and it awarded Cardenas $1.2 million in damages against the sellers for waste and ejectment.

Regarding plaintiffs' claim against Integrity for breach of contract in its role as escrow holder: The court found in favor of plaintiffs and awarded them $2,580,400 in damages plus additional amounts for prejudgment interest and attorneys' fees. Regarding plaintiffs' other claims against Integrity and its identical claims against escrow officer Hoang (i.e., the escrow defendants): The court found against the escrow defendants on the claims for negligence and breach of fiduciary duty and awarded against them the same $2,580,400 it had awarded against Integrity on the breach of contract claim. And it found in favor of the escrow defendants on the claims for negligence per se, fraud, violation of Penal Code section 496, and violation of Business & Professions Code section 17200.

In the course of stating these findings, the court made comments critical, not only of the buyer defendants, but also of the sellers, Cardenas, and the escrow defendants. Thus, for example, with regard to the sellers and Cardenas, it said that each of them "invited high risk and ultimately suffered great loss as a result of less than ideal due diligence and best practices in the respective transactions."

Regarding the escrow defendants, the court's comments distinguished between the claims arising from the real estate sale transactions and the claims arising from the business sale transactions. With regard to the former, the court found that the plaintiffs had not established that the escrow defendants: (1) "willfully deceived [p]laintiffs with any of the subject property escrows," (2) "aided and abetted theft or fraud in connection with any of the escrow transactions," or (3) "knowingly or recklessly disbursed funds not in accordance with escrow instructions." It also found that the

9

escrow defendants (4) "did not have a duty to perform due diligence on behalf of the parties" and that the buyers and sellers' escrow instructions (consisting of designated provisions in the real estate sale contracts) were "extremely unclear, convoluted, and inefficiently communicated."[11]

Nonetheless, the court also determined that the escrow defendants *did* have duties "to perform the instructions of the two sides in the respective escrow transactions," "to carry out written escrow instructions that would have allowed [the sellers] to secure their seller financed carryback loans in 1st position," "to inquire and clarify of . . . sellers and buyer[s] . . . what their

---

[11] The instructions that Urwell and sellers furnished to the escrow defendants for the two real estate sale contracts that had been prepared using the CAR *commercial* sale template were set forth in paragraph 24 of that form, as follows:

"24. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:

"A. The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder, which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: paragraphs 1, 3, 4B, 5A, 6, 7, 10, 11 D, 17, 18G, 21,22A, 23, 24, 30, 38, 39, 41, 42. The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions, if any, directly from Escrow Holder . . . To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder."

The instructions that Urwell and sellers furnished to the escrow defendants for the one real estate sale contract that had been prepared using the CAR *residential* sale template were set forth in paragraph 20 of *that* form and were to similar effect. The seller financing terms discussed *ante* were set forth in paragraph 3 of each of these contracts and in the seller financing addenda that were prepared using the CAR seller financing addendum template. The trial court found, and no party disputes on appeal, that these instructions were the only instructions that the sellers provided to the escrow defendants.

10

respective instructions were," and "to make sure . . . sellers['] carryback loans had first lien priority against each of the subject properties."  In addition, the court determined that, "by failing to inquire [into the conflict between the competing sets of escrow instructions, the escrow defendants] followed the instructions of [Cardenas] to the detriment of the [sellers]" and "failed to carry out the instructions of the . . . sellers" with respect to the real estate sale transactions.

But with regard to the business sale transactions, the court concluded those transactions were "separate" from the transactions involving the escrow defendants and that the escrow defendants, therefore, should not be considered "a parachute to soften the landing from" *those* transactions.

Following entry of judgment, plaintiffs and the escrow defendants timely appealed.

While the appeal was pending, the trial court heard and denied motions in which the escrow defendants argued, as they do on appeal, (1) that fraud on the part of the buyer defendants was an intervening cause that absolved the escrow defendants of liability, (2) that defenses that had not been discussed in the final statement of decision should operate to reduce the magnitude of the damages award against them, and (3) that the court should not have awarded prejudgment interest against them.

## II.    DISCUSSION

### A.    Plaintiffs' Assertions of Error

As noted *ante*, plaintiffs contend the trial court erred (1) in denying them a jury trial; (2) in concluding Cardenas had rights in the properties that were superior to their own; (3) in awarding damages against them; (4) in not exercising its equitable powers to cancel the Cardenas deeds of trust; and (5) in concluding that Franklin had not aided and abetted a breach of the escrow defendants' fiduciary duty to plaintiffs.

11

### 1. Right to a Jury Trial

To assess plaintiffs' arguments that they were erroneously denied a jury trial, we must first discuss certain aspects of the pretrial phase of this case.

#### a. Additional Background

In 2018, the year in which plaintiffs initiated what they and Cardenas refer to as the main action,[12] they and Cardenas each filed case management statements requesting a jury trial. Cardenas paid jury fees the same day it filed its case management statement. But plaintiffs did not.

In March of 2020, the first case management conference occurred. The following October, Cardenas initiated the three unlawful detainer actions discussed *ante*. Then in February 2021 Cardenas again paid jury fees, this time in connection with the unlawful detainer actions, and plaintiffs paid jury fees in the main action for the first time.

Later that year, on May 13, following a trial status conference presided over by Judge David M. Chapman, a minute order and trial setting order issued. The minute order said: "Plaintiff is deemed to have waived their rights to a jury trial for failure to timely post jury deposit as specified by CCP 631.[13] Cardenas . . . informs the Court they may decide at a later date to waive.

The trial setting order also addressed the issue of a right to a jury trial. It said:

---

[12] Meaning the present action without the inclusion of the unlawful detainer actions that were subsequently consolidated into it.

[13] Section 631, subdivision (c) of the Code of Civil Procedure, discussed *post,* says jury fees "shall be due on or before the date scheduled for the initial case management conference in the action."

> "The trial is set to commence on 12/3/2021.  [¶ . . . ¶]  By
> failing to deposit jury fees within the times specified by
> Code of Civil Procedure section 631, the right to a jury trial
> has been forfeited by . . . plaintiff(s) . . .  [¶]  Any request for
> relief from a forfeiture of the right to a jury trial must be
> brought in the form of a noticed motion to be heard no later
> than 21 days before the date first set for trial [i.e.,
> December 3, 2021]."

In a declaration Cardenas filed some 21 months later in support of a motion to bifurcate (see *ante*), its counsel described the May 13, 2021, trial status conference as follows:

> "There was a lengthy discussion . . . about Plaintiffs' failure
> to timely post jury fees.  The Court inquired as to whether
> Cardenas intended to waive jury trial.  I advised the Court
> at that time that Cardenas had demanded jury out of an
> abundance of caution at the outset of the case, as was its'
> [sic] right, but that it was likely that my client would later
> waive jury."

November 12, 2021—the date 21 days before the December 3, 2021, date first set for trial—came and went, and plaintiffs still had not paid jury fees.  Thereafter, the December 3, 2021, trial date was continued.

The following year (2022), the trial court consolidated the main action and the unlawful detainer actions, and Cardenas filed the second amended cross-complaint.  Then, in December of that year, Cardenas filed its motion to bifurcate trial of the unlawful detainer causes of action from the other causes of action.  In the papers it filed in support of this motion, Cardenas revealed it had decided to waive its right to a jury trial, except as to the unlawful detainer causes of action.

Two months later, in February 2023, plaintiffs filed a motion for relief from waiver of jury trial.  In their motion papers, they asked the trial court to

13

"exercise its discretion under Section 631(g)[14] to relieve Plaintiffs from any waiver of jury trial as was previously requested to Judge Chapman in May 2021." In support of this motion, they argued that "preserving the right to trial by jury is among the strongest judicial policies," that "all parties have repeatedly advised the court the action was a jury trial and it is currently set for a jury trial, so no defendant can show prejudice," that "[t]he law requires relief from waiver of the right to a jury trial upon request," and that:

> "[Judge Chapman's] decision . . . to not grant relief from waiver upon request at the trial setting conference where the fees had long since been paid, and the case was being set for jury trial anyway, appears inexplicable and to be an abuse of discretion, as it needlessly required Plaintiffs to incur the time and expense of filing this motion for relief, which under the law would have to be granted, including as provided in Section 631(g) of the Code of Civil Procedure."

As noted *ante*, each of the two motions was opposed. In its opposition to the motion for relief from waiver of jury trial, Cardenas argued that it had an inviolable right to waive jury trial at any time, that plaintiffs had long been on notice of the likelihood that it would exercise this right, that plaintiffs were not entitled to rely on Cardenas's invocation of the right to a jury trial, that they had waived their right to a jury trial, that they had long been on notice of the court-ordered deadline for seeking relief from that waiver, that the deadline had passed, and that Cardenas "would be highly prejudiced by a jury trial."

In support of its prejudice argument, Cardenas argued that "[p]laintiffs' case [was] almost entirely focused on 'unwinding' the Cardenas foreclosures

---

14     Code of Civil Procedure section 631, subdivision (g), discussed *post,* says: "The court may, in its discretion upon just terms, allow a trial by jury although there may have been a waiver of a trial by jury."

14

and regaining the three Palm Springs [p]roperties," that "[t]hese causes of action, as well as Cardenas' defenses thereto, are entirely equitable in nature and not triable by jury," and that:

> "[I]t is clear . . . that [p]laintiffs' intent is to seek a full jury for the entire case, which will result in a trial far longer than the parties originally estimated and will no doubt result in confusing and conflicting arguments about which facts and issues should be decided by the Court and which should be decided (or 'assisted') by jury. Plaintiffs' apparent strategy in this regard is to have the jury hear extensive evidence that is irrelevant to the equitable issues, and then convince the Court that it should decide the outcome of the equitable issues based upon the jury's determination of the facts. [T]hey intend to argue facts and issues to the jury that are properly only considered by the Court in equity."

On March 8, 2023, two days before trial call, the trial judge heard the motion for relief from waiver of jury trial. In his tentative ruling on this motion, he wrote:

> "It is undisputed that Plaintiffs failed to timely post their jury fees prior to the initial case management conference on March 16, 2020. Judge Chapman expressly stated the same in his Trial Setting Order of May 13, 2021. That same trial setting order required any relief from waiver of jury trial shall be brought 'no later than 21 days before the first date set for trial.' Plaintiffs seemingly acknowledge Judge Chapman's Order, but simply conclude it was wrong and provide no reason as to why they waited until the week before trial to attempt to seek relief. Courts have denied as untimely requests for relief made on or near the day of trial. [Citations.] Plaintiffs have provided no reasonable excuse for their failure to wait until the eve of trial to seek relief."

At the hearing, The judge added:

> "What the court finds [most] persuasive . . . is the timing of this request for waiver. [¶] . . . [T]hat request for waiver really should have been done quite some time ago. [¶]

15

Because . . . if all the parties are doing their good faith parts to comply with the local rule regarding the joint preparation of the trial documents, it's important to know whether this is going to proceed by way of bench trial or a jury trial. [¶] For example, you may not need to discuss jury instructions on certain causes of action because those will proceed by way of bench trial. [¶] You may not need verdict forms because, again, those may proceed by way of bench trial. [¶] But the fact that this has been left up in the air two days prior, when really this -- this information really should already be in your binders just waiting to be delivered to the court in two days, it's this eleventh-hour request that the court really finds most persuasive and its reason for denying it."

At the conclusion of the hearing, the judge confirmed his tentative ruling and denied the motion.

### b. Analysis

In support of their contention that the trial court erred in denying them a jury trial, plaintiffs argue: (1) that they did not waive the right to a jury trial; (2) that, even if they did waive that right, the trial court abused its discretion by denying them relief from the waiver;[15] and (3) that they were prejudiced as a result. In addressing these arguments, we turn to subdivisions (b), (c), (f), and (g) of Code of Civil Procedure section 631.[16]

### i. Waiver

Subdivision (b) of section 631 says that: "At least one party demanding a jury on each side of a civil case shall pay a nonrefundable fee of one hundred fifty dollars ($150), unless the fee has been paid by another party on

---

[15] Plaintiffs also present arguments as to which specific causes of action they contend entitled them to a jury trial. However, our resolution of their other arguments renders it unnecessary for us to address these arguments.

[16] Subsequent undesignated statutory references are to the Code of Civil Procedure.

16

the same side of the case."  Subdivision (c) says that (except in circumstances not present here) "[t]he fee described in subdivision (b) shall be due on or before the date scheduled for the initial case management conference in the action."

As discussed *ante*, the initial case management conference in this action occurred on March 16, 2020.  Thus, by operation of subdivisions (b) and (c), the deadline to pay jury fees was March 16, 2020.  None of the plaintiffs paid jury fees until February 2, 2021 (see *ante*), some 11 months after the March 16, 2020, deadline to do so had passed.  Hence plaintiffs failed to timely pay jury fees.

Subdivision (f)(5) of section 631 spells out the consequences of a failure to timely pay jury fees: "A party waives[17] trial by jury . . . [b]y failing to timely pay the fee described in subdivision (b), unless another party on the same side of the case has paid that fee." Thus, pursuant to subdivision (f)(5), plaintiffs waived the right to a jury trial as of March 16, 2020.

### ii. Relief from Waiver

We are not aware of any principle or provision, nor have the parties cited us to one, that would entitle a party to reverse a waiver of the right to a jury trial merely by paying jury fees after the right to a jury trial has been waived. Nonetheless, a party's waiver of the right to a jury trial does not

---

[17] The terms "waive," "waives," and "waiver" as used in section 631 are somewhat of a misnomer inasmuch as the loss of a jury trial right pursuant to section 631 will in many instances be the result of what the law customarily recognizes as a forfeiture rather than a waiver. (*Applera Corp. v. MP Biomedicals, LLC* (2009) 173 Cal.App.4th 769, 791 [" 'Over the years, cases have used the word [waiver] loosely to describe two related, but distinct, concepts: (1) losing a right by failing to assert it, more precisely called forfeiture; and (2) intentionally relinquishing a known right. "[T]he terms 'waiver' and 'forfeiture' have long been used interchangeably. The United States Supreme Court recently observed, however: 'Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." ' " ' " ' "]; *K.R. v. Superior Court of Napa County* (2022) 80 Cal.App.5th 133, 142 ["The distinction is a critical one, as 'forfeiture results from the failure to invoke a right, while waiver denotes an express relinquishment of a known right; the two are not the same.' "]; *TriCoast Builders, Inc. v. Fonnegra* (2024) 15 Cal.5th 766, 782-783 (*TriCoast*) ["Over the course of the last century, . . . the statutory bases for finding jury waiver have expanded well beyond what we would ordinarily term 'waiver' of a constitutional right, to encompass noncompliance with various procedural requirements for making jury demands, including requirements to post jury fees at the correct time or in the correct amount."].) In keeping with the phraseology of section 631, we use the term "waiver" in this opinion to refer to a waiver *or* a forfeiture.

altogether foreclose the availability of a jury trial, as subdivision (g) of section 631 furnishes a mechanism for potentially obtaining relief from the waiver. This subdivision says that: "The court may, in its discretion upon just terms, allow a trial by jury although there may have been a waiver of a trial by jury." (See *TriCoast, supra,* 15 Cal.5th at p. 782 ["Section 631(g) alleviates the harshness of [inadvertent waiver (i.e., forfeiture)] by allowing courts to forgive a party's technical noncompliance when the party has fulfilled the core objective of the statute, which is to give timely notice that a jury is demanded."].)

In deciding whether it should exercise its discretion to grant relief to a plaintiff who has waived his right to a jury trial, "a court properly considers a host of essentially equitable factors" (*TriCoast, supra,* 15 Cal.5th at p. 784), including, for example, "whether relief would cause hardship to other parties . . . ; the timeliness of the request; the party's willingness to comply with applicable jury fee obligations; and the party's reasons for seeking the relief. (*Id.*, at p. 783.) Other factors considered include "whether [the other party's] belated withdrawal of [its] jury demand right before trial began was a tactical decision and, if so, whether that sort of tactical decision should be rewarded"; and "the fact [that the party seeking relief] could have sought to protect itself from any last-minute waiver on [the other party]'s part by having posted its own jury fees." (*Id.,* at p. 784.)

When as here litigants challenge the denial of relief from jury waiver on direct appeal from a judgment (as distinguished from a writ), they must

demonstrate prejudice.[18]  (*TriCoast, supra,* 15 Cal.5th at pp. 774, 788–791.)

But, to justify reversal, this prejudice cannot consist merely of the lost

opportunity to try one's case to a jury.  (*Id.,* at p. 789, citing with approval

*Glogau v. Hagan* (1951) 107 Cal.App.2d 313, 318–319 [" 'prejudice cannot be

presumed from the fact that appellants did not try their case to a jury';

rather, 'it is presumed that they enjoyed the benefits of a fair and impartial

trial as contemplated by the Constitution and the statutes' "], *Holbrook &*

*Tarr v. Thomson* (1956) 146 Cal.App.2d 800, 803 (*Holbrook*) [same], *Harmon*

*v. Hopkins* (1931) 116 Cal.App. 184, 188 (*Harmon*) [same].)  Nor may it

consist of wasted effort in preparing for a jury trial.  (*TriCoast,* at pp. 790–

791.)

Applying these principles to the record on appeal in the present case,

we have little difficulty concluding that the trial court did not abuse its

---

[18]    Notably, "the denial of relief from jury waiver is not the same thing as deprivation of the constitutional right of jury trial."  (*TriCoast, supra,* 15 Cal.5th at p. 788.)  Whereas the latter is considered a "structural defect or error" (*id.,* at p. 786) warranting "automatic reversal" (*id.,* at p. 787), the former is not.  In the words of our Supreme Court:

"[O]f course . . . both roads ultimately lead to the same place, which is trial to a court rather than to a jury.  Yet the fundamental constitutional interests at stake differ.  While the California Constitution recognizes trial by jury as an 'inviolate right,' it also states that the right may be waived.  (Cal. Const., art. I, § 16.)  Where a party has validly waived its jury right, the question whether to grant a jury trial notwithstanding waiver raises no question of the deprivation of a constitutionally guaranteed framework for the conduct of trial.

"A party that has waived its right to a jury trial no longer has that right. . .  That is different from a situation where a party that has properly invoked its jury trial right and had that right wrongly denied—where, that is, the party has been deprived of the constitutional right it did not give up in the first place."  (*Id.,* at p. 788.)

discretion in denying plaintiffs' motion for relief from jury waiver.[19] As a threshold matter plaintiffs did not assert, let alone demonstrate, to the trial court any cognizable prejudice that would have resulted from a denial of their motion; nor do they demonstrate any such prejudice on appeal.[20] This circumstance alone defeats plaintiffs' appeal insofar as it pertains to the denial of a jury trial. (*TriCoast, supra,* 15 Cal.5th at p. 774 [on a direct appeal (as distinguished from a writ) "prejudice from the denial of section 631(g) relief will not be presumed but must be shown"].)[21]

---

[19]   Our conclusion that denial of the motion was not error moots plaintiffs' prejudice argument.

[20]   Among the argument headings in plaintiffs' opening brief is one that reads: "Appellants suffered prejudice as  result of the court's failure to grant relief from jury waiver."  But the discussion that follows this heading does not articulate any form of prejudice.  In their reply brief, plaintiffs argue that they were prejudiced because "a jury likely would have viewed the credibility of witnesses quite differently than the trial judge did" and might have found in favor of plaintiffs on claims that, in the absence of a waiver, would have been jury triable.  But this is precisely the sort of prejudice that *TriCoast, Glogau, Harmon, and Holbrook, supra,* all indicate are not cognizable on a challenge to the denial of relief from a jury waiver.  (See *ante.*)

[21]   Even if plaintiffs *could* demonstrate some cognizable form of prejudice from the denial of their motion, that prejudice would also need to outweigh the other pertinent factors the trial court and Cardenas cited in their assessments of the motion.  E.g., plaintiffs' failure to either comply with the previous judge's order or challenge it via writ of mandate (see *TriCoast, supra,* 15 Cal.5th at pp. 785–786 ["the cases recognize writ review as the preferred method for securing an erroneously denied jury trial, because writ review permits the issue to be settled before trial ever begins, thus avoiding repetitive litigation and promoting judicial economy"]), their delay in bringing the motion for relief, the logistical complications resulting from the motion being heard so close to trial, and the prejudice cited by Cardenas.

Although plaintiffs cite a variety of grounds on which they contend the denial of a jury trial was unjust, none is sufficient. By way of example: Plaintiffs point out that they consistently requested a jury trial and that they paid jury fees two years before the actual trial. But as discussed *ante*, under Code of Civil Procedure section 631, those circumstances do not preclude or reverse a jury trial waiver, nor do they suffice by themselves to relieve a litigant of the consequences of such a waiver.

Plaintiffs further argue that they should be permitted to benefit from the fact that *Cardenas* consistently requested a jury trial and paid jury fees. But, as discussed *ante*, Cardenas had placed them on notice years before they brought their motion for relief that it (Cardenas) might, and probably would, waive jury. And, even if it had not placed them on notice, they still would not have been entitled to rely on Cardenas having done for *it*self what they failed to do for *them*selves. (*TriCoast, supra,* 15 Cal.5th at p. 784 ["each side must make its own timely jury demand and pay its own fees, and there is nothing to stop a party that has timely demanded a jury trial from dropping that demand on the eve of trial, or even during the trial itself"]; § 631, subd. (b) ["[p]ayment of the fee by a party on one side of the case shall not relieve parties on the other side of the case from waiver pursuant to subdivision (f)"].)

Plaintiffs also argue that the amended cross-complaints Cardenas filed in 2022 injected new jury triable claims (such as Cardenas's claim asserting waste) two and a half years after the deadline to pay jury fees had elapsed, one and a half years after plaintiffs had paid jury fees, and just seven months before the trial, and that they should not be penalized, by denial of a jury trial, for a waiver that occurred before those claims were added to the action. Certainly, this circumstance is relevant. But, in light of such other

22

circumstances as plaintiffs' failure to comply with the previous judge's order (or challenge it via writ of mandate), their delay in bringing the motion, the logistical complications resulting from the motion being heard so close to trial, and the prejudice cited by Cardenas, it does not support a conclusion that the trial court's decision to deny the motion for relief from jury waiver was arbitrary, capricious, or patently absurd. In other words, it does not support a conclusion that the trial court abused its discretion. (*In re Caden C.* (2021) 11 Cal.5th 614, 641 ["A court abuses its discretion only when" the decision it makes is " ' " 'an arbitrary, capricious, or patently absurd determination.' " ' "].)

Consequently, the trial court did not err in denying plaintiffs a jury trial.

## 2. Validity and Priority of Cardenas Deeds of Trust

Plaintiffs' next contention is that the trial court erred in concluding the Cardenas deeds of trust were valid and entitled to priority (i.e., in concluding Cardenas had rights in the properties that were superior to their own). In support of this contention, they argue (1) that the buyer defendants had no equity or title in the properties for Cardenas to encumber because the sellers' grant deeds were never delivered to the buyer defendants;[22] and (2) that Cardenas had constructive knowledge of the seller deeds of trust and was not a good faith encumbrancer.

_____

[22] Cardenas's only response to the plaintiffs' non-delivery argument is that the argument was waived because it was not presented below. It is true that "[a]n appellate court ordinarily will not consider arguments made for the first time on appeal" (*C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1491 (*C9 Ventures*), citing *Ward v. Taggart* (1959) 51 Cal.2d 736, 742); however, "[t]his rule does not apply . . . if the new argument [is one that] raises a pure issue of law on undisputed facts." (*C9 Ventures*, at p. 1492.) As discussed *ante*, the plaintiffs' non-delivery argument is such an argument.

23

Insofar as the first of these arguments is concerned, we begin with the observation that a deed does not vest title in a grantee unless and until it has been delivered to the grantee.  (*Luna v. Brownell* (2010) 185 Cal.App.4th 668, 672; Civ. Code § 1054 ["A grant takes effect, so as to vest the interest intended to be transferred, only upon its delivery by the grantor.'].)  But, importantly, the term "delivery" as used in this context does not have its ordinary meaning.

> "The term 'delivery' does not refer to the mere physical act of manually transferring the instrument to the grantee.  A legal delivery refers solely to the intention of the grantor. . . .  If the grantor does not have the required intent, there is no legal delivery even if the grantee obtains physical possession of the instrument.
>
> "[¶ . . . ¶]
>
> "Because delivery is predicated on the grantor's intent to vest title immediately in the grantee, when the evidence indicates that the grantor did not have the necessary intent, the mere possession of the deed by the grantee, by itself, is not a sufficient proof of such intent, even when title has been conveyed to a bona fide purchaser."  (3 Miller & Starr, Cal. Real Estate (4th ed. 2025) Deeds and Descriptions, §§ 8:41, 8:44, fns. omitted.)

In keeping with this construction of the term "delivery," in situations in which " 'a deed is placed in . . . escrow, with an agreement between the grantor and grantee that it shall not be delivered to the grantee until he has complied with certain conditions, the grantee does not acquire any title to the land, nor is he entitled to a delivery of the deed, until he has strictly complied with the conditions.' "  (2 Miller & Starr, Cal. Real Estate (4th ed. 2025) Escrows, § 6:1, fn. omitted, quoting *Dyson v. Bradshaw* (1863) 23 Cal. 528; accord 2 Miller & Starr, *supra*, Escrows, § 6:17 ["When the escrow holder wrongfully delivers a document or money entrusted to the escrow, title does

not pass to the recipient."]  "If [the grantee] does not comply with the conditions . . . , the escrow holder cannot make a valid delivery of the deed to him."  (*Promis v. Duke* (1929) 208 Cal. 420, 425; see also *Gould v. Wise* (1893) 97 Cal. 532, 536.)

As can be seen, a deed that is recorded against the express instructions of the grantor is an undelivered deed.  (*Montgomery v. Bank of America Nat. Trust & Savings Assn.* (1948) 85 Cal.App.2d 559, 564.)  As such, "[a] void instrument . . . does not convey anything[,] and cannot be made the foundation of a good title."[23]  (*Ibid.*; see also *Powell v. Goldsmith* (1984) 152 Cal.App.3d 746, 749–750; *Barr v. Schroeder* (1867) 32 Cal. 609, 616 ["Without a delivery [a deed] is not voidable, but it is void—a mere nullity"]), even as against a good faith purchaser or encumbrancer.  (See *Trout v. Taylor* (1934) 220 Cal. 652, 656 ["Numerous authorities have established the rule that an instrument wholly void, such as an undelivered deed, . . . cannot be made the foundation of a good title, even under the equitable doctrine of *bona fide* purchase."]; *Firato v. Tuttle* (1957) 48 Cal.2d 136, 139.)

In the present case the trial court found, and no party disputes, that Urwell and the sellers agreed the seller's deeds of trust would record in first priority position.  In keeping with this agreement (see *ante*), each of the three real estate sale contracts identified just one loan—that being the seller financing—and in none of those contracts was there a check mark in the box that was to be checked in the event that the transaction were to include a

---

23    Describing the implications of an instrument being void, our Supreme Court said in *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 929, that: "A void contract is without legal effect.  [Citation.]  'It binds no one and is a mere nullity.'  [Citation.]  'Such a contract has no existence whatever.  It has no legal entity for any purpose and neither action nor inaction of a party to it can validate it.' "

"second loan." As also discussed *ante*, in none of the three seller financing addenda was there a check mark in the box to be checked in the event the transaction were to include "junior financing" or "senior loans and encumbrances." In other words the contracts provided, not only (as the trial court concluded, see *ante*) that there would be no loans or encumbrances senior to the seller financing, but that there would be no other loans involved in the transaction at all.

This interpretation of the purchase and sale agreements leads ineluctably to a conclusion that, as a matter of law, the absence of any financing apart from the seller financing was an express condition of plaintiffs and a condition of the sale and therefore the deed was legally undelivered. (See *Estate of Jones* (2022) 82 Cal.App.5th 948, 953 ["In the absence of extrinsic evidence, . . . interpreting a contract is a matter of law subject to de novo review"]; *Osborn v. Osborn* (1954) 42 Cal.2d 358, 363–364 [holding, in a case involving seller escrow instructions expressed exclusively in writing, that, because "[d]elivery is a question of intent," it is " 'a pure question of law whether there was an absolute delivery or not' "].) As the trial court found, this condition was not satisfied.

The condition having not been satisfied, delivery of the grant deeds to the buyer defendants was a nullity and title did not vest in them. (*Todd v. Vestermark* (1956) 145 Cal.App.2d 374 ["[A] delivery or recordation by . . . the escrow holder prior to full performance of the terms of the escrow is a nullity. No title passes."].) As a consequence, the deeds vesting title in Zenith were and are void; and—inasmuch as a void deed cannot be made the foundation of good title (see *ante*)—they had the effect of nullifying the Cardenas deeds of trust and rendering *them* void. (See *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 887 [describing

26

as "well-settled law" the principle that "a void instrument infects the entire chain of title, such that any subsequent conveyance stemming from the void instrument is also void as a matter of law"]; see also *OC Interior Services, LLC v. Nationstar Mortgage, LLC* (2017) 7 Cal.App.5th 1318, 1335 ["a void judgment in the chain of title has the effect of nullifying a subsequent transfer, including a transfer to a purported bona fide purchaser"].)[24]

This being the case, the judgment must be reversed insofar as it: (1) adjudicates the sellers' quiet title and cancellation of instruments claims in favor of Cardenas and against the sellers, (2) quiets title to the properties in Cardenas, (3) adjudicates Cardenas's waste and ejectment claims in favor of Cardenas and against the sellers, and (4) awards Cardenas damages on the waste and ejectment claims. In addition, the trial court shall be instructed to enter judgment on remand: (1) quieting title in fee simple to the properties in the sellers as against Zenith and Cardenas, free and clear of any claimed interests by Zenith or Cardenas, as of September 28, 2017,[25] and (2) cancelling the Cardenas deeds of trust and the trustee deeds.[26]

---

[24] Our determination that the Cardenas deeds of trust were and are void renders it unnecessary for us to address plaintiffs' arguments that Cardenas had constructive knowledge of the seller deeds of trust and was not a good faith encumbrancer.

[25] The fourth amended complaint identified Zenith, Cardenas, and Mojtaba Sabahi as the parties against whom the sellers' quiet title claim was directed and stated that the sellers "seek . . . to quiet title in fee simple to the [properties] against [Zenith, Cardenas, and Sabahi], free and clear of any claimed interests by [those parties] as of September 28, 2017, the day before the close of the three escrows." As discussed *ante*, Zenith was defaulted before trial and found at trial to have defrauded the sellers in the real property sale transactions, and the Cardenas deeds of trust were and are void, thus warranting a conclusion that the sellers' rights in the properties were superior to Zenith's and Cardenas's rights in the properties. As for

27

### 3. Aiding and Abetting, as Asserted Against Franklin

Plaintiffs' final contention is that the trial court erred in granting a non-suit for the claim in which they had asserted that Franklin aided and abetted the escrow defendants' breach of fiduciary duty. In addressing this contention, we begin with principles governing aiding and abetting liability in California.

"California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort." (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144 (*Casey*).) Pursuant to this rule, "[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 846 (*Saunders*); see also *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1475 (*American Master Lease*) [California courts have consistently followed and applied the two-part alternative test for civil aiding and abetting liability [set forth] in *Saunders* and *Casey*; citing cases].)

---

Sabahi, there are indications in the record on appeal that the sellers may have either settled their quiet title claim as against him or dismissed him as a defendant in the action. Inasmuch as the appellate record is unclear as to Sabahi, the trial court shall include the sellers' quiet title claim as pleaded against Sabahi among the matters to be considered on remand.

26 The fourth amended complaint identified the Cardenas deeds of trust and the trustee deeds as the instruments that the plaintiffs desired the court to cancel.

To these elements, some opinions also "seem to" impose, as a further element, a requirement that "the aider and abettor had the specific intent to facilitate the wrongful conduct."  (*Schulz v. Neovi Data Corp.* (2007) 152 Cal.App.4th 86, 95, citing *Gerard v. Ross* (1988) 204 Cal.App.3d 968, 251 and *Howard v. Superior Court* (1992) 2 Cal.App.4th 745; see also *Fox Paine & Co., LLC v. Twin City Fire Ins. Co.* (2024) 104 Cal.App.5th 1034, 1059; and *American Master Lease, supra,* 225 Cal.App.4th at p. 1476 ["Moreover, knowledge alone, even specific knowledge, is not enough to state a claim for aiding and abetting.  California law 'necessarily' requires that for aiding and abetting liability to attach, a defendant have made ' " 'a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.' " ' "].)

As noted *ante*, plaintiffs in the present case included in the fourth amended complaint a claim against Franklin for aiding and abetting each of two torts:  fraud and breach of fiduciary duty.  The fraud to which the aiding and abetting claim applied was the real estate transaction fraud alleged against both the buyer defendants and the escrow defendants.  The fiduciary duty to which the aiding and abetting claim applied was that alleged against the escrow defendants.  As noted *ante*, one of the defendants against whom the aiding and abetting claim was asserted was Franklin; and, following the conclusion of the plaintiffs' case in chief, the trial court granted Franklin's motion for judgment in its favor.

During the parts of the hearing on that motion that focused on the aiding and abetting claim, plaintiffs distinguished between the two different aspects of their aiding and abetting claims as to Franklin (i.e., the aspect that focused on fraud alleged against the buyer defendants and the escrow defendants versus the aspect that focused on the breach of fiduciary duty

alleged only against the escrow defendants). At the conclusion of the hearing, the trial judge expressed skepticism regarding the adequacy of plaintiffs' proof pertaining to Franklin's intent; and he subsequently granted the motion.

Thereafter, in addressing the matter in his final statement of decision, the trial judge explained his rationale as follows:

> "After considering the argument of counsel for both sides, the court found that the evidence presented by [p]laintiffs did not establish, by a preponderance of the evidence, the knowing and willful intent of . . . Franklin to aid and abet *buyer [d]efendants in their fraudulent scheme.* The court was not convinced either by direct or circumstantial evidence of aiding and abetting by . . . Franklin. Absent the requisite intent, the court concluded that the evidence simply could not support a [p]laintiff[s'] verdict as to this cause of action." [Italics added.]

The language we have italicized appears to indicate that, in granting Franklin's motion, the trial court was focusing on the aspect of the aiding and abetting claim that pertained to the buyer defendants' fraud—but not on the aspect of the aiding and abetting claim that pertained to the escrow defendants' breach of fiduciary duty. As a consequence, the judgment must be reversed to the extent it adjudicates the portion of the aiding and abetting claim that pertained to the escrow defendants' breach of fiduciary duty, so that on remand the trial court may consider and rule on whether Franklin aided and abetted such breaches.[27]

---

[27] We will not disturb the judgment to the extent it adjudicates the portion of the aiding and abetting claim against Franklin that pertains to the buyer defendants' fraud in the real estate sale transactions (as opposed to the portion of that claim that pertains to the escrow defendants' breach of fiduciary duty) because plaintiffs have not challenged that portion of the aiding and abetting claim on appeal.

## B. The Escrow Defendants' Assertions of Error

The escrow defendants do not challenge the trial court's conclusion that they committed breaches of the sort necessary to establish claims for breach of contract, breach of fiduciary duty, and negligence. They do, however, contend the court erred (1) in not concluding that the buyer defendants' fraud was an intervening or superseding cause absolving the escrow defendants of liability, (2) in not adjudicating the escrow defendants' comparative-fault and failure-to-mitigate-damages defenses, and (3) in awarding prejudgment interest against them.

### 1. Causation

As noted *ante*, the escrow defendants contend that the buyer defendants' fraud constituted an intervening or superseding cause that absolved them (the escrow defendants) of liability. In support of this contention, they argue (1) that the findings set forth in the final statement of decision compel a conclusion that the buyer defendants' fraud was unforeseeable; and (2) that this conclusion in turn compels a further conclusion that the harm the sellers suffered should be attributed to the buyer defendants' fraud rather than to the escrow defendants' breaches.[28] In addressing these arguments, we begin with a brief discussion of concepts pertaining to causation and the foreseeability of intervening acts.

---

[28] The escrow defendants also argue that, in the circumstance of this case, the tort concept of an intervening or superseding cause should be applied, not only to the breach of fiduciary duty and negligence claims asserted against them, but also to the contract claim asserted against them because the contract claim "sounded in tort." (See *post*.) But our conclusion *post* that the harm the sellers suffered was foreseeable renders it unnecessary for us to address this argument.

31

As a general matter, " 'causation . . . involves two elements.  " 'One is cause in fact.  An act is a cause in fact if it is a necessary antecedent of an event.' [Citation.]"  [Citation.]  The second element is proximate cause. " '[P]roximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." ' " ' " (*Tung v. Chicago Title Co.* (2021) 63 Cal.App.5th 734, 745 (*Tung*).)

" 'The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, the defendant will nevertheless be absolved because of the manner in which the injury occurred.  Thus, where there is an independent intervening act that is not reasonably foreseeable, the defendant's conduct is not deemed the "legal" or proximate cause.  Rules of legal cause, therefore, operate to relieve the defendant whose conduct is a cause in fact of the injury, where it would be considered unjust to hold him or her legally responsible.' " (*Tung, supra,* 63 Cal.App.5th at p. 745, quoting 6 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1335.)

"To determine whether an independent intervening act was reasonably foreseeable, we look to the act and the nature of the harm suffered. [Citation.]  To qualify as a superseding cause so as to relieve the defendant from liability for the plaintiff's injuries, both the intervening act and the results of that act must not be foreseeable.  [Citation.]  Significantly, "what is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence."  [Citation.] Whether an intervening force is superseding or not generally presents a question of fact, but becomes a matter of law where only one reasonable conclusion may be reached.' " (*Tung, supra,* 63 Cal.App.5th at p. 745, quoting

32

6 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1333; accord *Chanda v. Federal Home Loans Corp.* (2013) 215 Cal.App.4th 746, 755–756 (*Chanda*).)

Applying these principles here, we begin with the observation that the harm the sellers suffered was the loss of the $2,580,400 in funds that they loaned to the buyer defendants (and, related thereto, the subordination and elimination of the liens of their deeds of trust that were intended to secure repayment of the loans). The escrow defendants' conduct was an actual cause of this harm inasmuch as it is reasonable to conclude that, had they performed their duties to the sellers by alerting them to the involvement of another lender and the existence of conflicting escrow instructions, then the sellers would most likely have elected to abort the real estate sale transactions and thus would not have suffered such harm.

That persons bent on perpetrating a fraud (including, for example, buyers of real property) could capitalize on an escrow holder's lapses is in our view not an eventuality so far from the contemplation of participants in an escrow as to be unforeseeable, and thus absolve the escrow holder of liability, as a matter of law. Indeed, even if the buyers had not been committing fraud and even if the sellers and Cardenas had been made aware of one another's involvement (yet not realized there was a conflict in their expectations and instructions as to lien priority), one of them—either the sellers or Cardenas— would inevitably have been harmed by the escrow defendants' failure to alert them to the existence of conflicting escrow instructions, because one of them (either the sellers or Cardenas) would have found themselves holding a security interest in the property that was inferior to what they had bargained for and insufficient to secure their loans.

Our conclusion in this regard is not unlike that expressed in a passage in *Tung,* wherein the reviewing court opined that: "[I]n the face of alleged tortious conduct by an escrow holder . . . , it is foreseeable that a buyer might seek to capitalize on the escrow holder's errors or misconduct, making it necessary for a seller to bring legal action to resolve conflicting claims over who has the right to possession of the property."[29] (*Tung, supra,* 63 Cal.App.5th at p. 747 [reversing judgment]; see also *Chanda, supra,* 215 Cal.App.4th at pp. 756–757 [concluding that "the submission of forged loan documents [to escrow] was highly foreseeable" and that the "result[ing] . . . loss of [lender's] investment was also highly foreseeable;" reversing judgment].) Of course, in the present case, the sellers sued to resolve conflicting positions with regard to title, security interests, and damages, rather than conflicting positions with respect to possession and damages, but the principle remains the same: Mischief enabled by an escrow holder's breach of its duties is foreseeable.

---

[29] In *Tung*, a seller of real property was defrauded by his realtors. (*Tung, supra,* 63 Cal.App.5th at pp. 740–741.) The seller sued the realtors, the buyer, and the escrow holder, asserting claims for (among other things) rescission, quiet title, cancellation of instruments, breach of fiduciary duty, and fraud. (*Id.,* at p. 741.) Among his allegations against the escrow holder was a claim that it had failed to comply with, and seek clarification regarding, the terms of the parties' escrow instructions. (*Ibid*.) The escrow holder filed a motion in limine to exclude evidence pertaining to amounts of lost income and attorneys' fees that the seller attributed to title- and possession-related disputes with the buyer pertaining to the property that had been the subject of the sale. (*Id.,* at pp. 742, 745.) The trial court granted the motion, and it cited as its reason for doing so a conclusion that such damages "were not foreseeable, having been caused by the 'independent acts' " of the buyer and seller " 'having nothing to do with [the escrow holder's] activities." (*Ibid*.) As discussed *ante*, the court of appeal reversed.

Thus the trial court did not err in rejecting the escrow defendants' arguments that the buyer defendants' fraud constituted an intervening or superseding cause of the sellers' harm.

### 2. Affirmative Defenses

The escrow defendants' second contention on appeal is that they "were deprived their day in court" with respect to two of their affirmative defenses—comparative fault and failure to mitigate damages—because the trial court did not address these defenses in its final statement of decision.[30] In addressing this contention, we begin with the comparative fault defense.

### a. Comparative Fault

Under principles of comparative fault, a defendant's negligent conduct is assigned a percentage of fault if the conduct was a substantial factor in causing a plaintiff's injuries, and then responsibility for damages associated with those injuries is apportioned to the defendant in direct proportion to its percentage of fault. (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 591–592.)

But these principles do not apply to fault in the form of a breach of contract as distinguished from a tort. (See, e.g., *Fresno Air Service v. Wood* (1965) 232 Cal.App.2d 801, 807 ["contributory negligence . . . [is] not applicable as . . . [a] defense[] to actions for . . . breach of contract."]; *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 413 (Mosk, J., concurring) ["Actions in contract do not allow an affirmative defense of comparative fault."]; *F.D.I.C. v. Varrasso* (E.D. Cal., Apr. 10, 2012, No. CIV.

---

[30] The escrow defendants also refer to a "frustration of purpose" defense; however, we discern no such defense among the affirmative defenses pleaded in their answer to the fourth amended complaint.

2:11-2628 WBS) 2012 WL 1197712, at *3 ["It is well established that comparative fault is not a defense to a breach of contract claim."].)

Hence, even if principles of comparative fault were to whittle down the $2,580,400 in damages awarded against the escrow defendants in connection with their liability for negligence and breach of fiduciary duty, they still would be responsible for payment of 100% of the $2,580,400 amount in connection with their liability for breach of contract.

Presumably for this reason the escrow defendants contend the breach of contract claim against them "sounded in tort." To support this contention,[31] they emphasize that they did not sign the escrow instructions, and they argue that their duties to the sellers therefore were "implied or common law duties" rather than duties rooted in contract. On these bases, they further argue that, "even though a written instrument may be the *source* of an escrow holder's legal duty, when the breach arises from implied or common law duties, . . . the claim sounds in negligence" and thus should be subject to the principles of comparative fault.

But the fact that the escrow defendants' assent to the terms of the escrow instructions in the real estate sale contracts was not accompanied by their signatures is irrelevant. As our Supreme Court has held in a case in which an escrow holder accepted an escrow orally rather than in writing: "Upon the escrow holder's breach of an instruction that it has contracted to perform or of an implied promise arising out of the agreement with the buyer

_____

[31]    Citing *Amen v. Merced County Title Co.* (1962) 58 Cal.2d 528, 532, the escrow defendants also point out in support of this argument that, "[f]or there to be a claim against an escrow holder for breach of a written contract, the escrow holder must 'accept[]' written escrow instructions and offer to perform them, and both the buyer and seller must accept that offer." But it is beyond dispute that those conditions were met in this case.

or seller, the injured party acquires a cause of action *for breach of contract*." (*Amen v. Merced County Title Co.* (1962) 58 Cal.2d 528, 532 [italics added]; see also *Lucioni v. Bank of America, N.A.* (2016) 3 Cal.App.5th 150.)

Although it is true that "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts" (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774), this is not to say that a breach of contract claim arising from such an act "sounds in" tort and thus implicates principles applicable to torts any more than it is to say that a tort claim arising from such an act "sounds in" contract and thus implicates principles applicable to the breach of a contract. (See *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group* (2006) 143 Cal.App.4th 1036, 1044 [noting that "the Supreme Court has expressly held that the negligent breach of . . . a duty [of care arising from an implied contract] does not give rise to tort damages" and declined to "convert[ ] a breach of contract into a tort for some purposes but not others," lest the distinction between tort remedies and contract remedies be rendered "meaningless;" citing in part *Erlich v. Menezes* (1999) 21 Cal.4th 543, 554].)

For these reasons, we conclude: (1) that principles of comparative fault do not apply to the $2,580,400 that was awarded against the escrow defendants for the breach of contract claim; and, as a consequence, (2) that, if the court erred in not applying those principles to the awards against them in the same amount for the negligence and breach of fiduciary duty claims, they cannot have been prejudiced thereby.

### b. Failure to Mitigate Damages

Turning to the argument that the escrow defendants were denied a ruling with respect to their failure-to-mitigate-damages defense, we observe on our review of the record that the escrow defendants requested a ruling on this defense when they asked the trial court in their post-judgment motions

to rule on their comparative-fault defense, that they submitted briefs to the court regarding both defenses, and that the court heard argument regarding both defenses. Yet, in the order that issued following the hearing, the court addressed only the comparative-fault defense and not the failure-to-mitigate-damages defense. Thus we instruct the trial court on remand to consider and rule on the escrow defendants' post-trial motion to the extent it pertained to the failure-to-mitigate-damages defense.

### 3. Award of Prejudgment Interest

The escrow defendants' final contention is that the trial court erred in awarding prejudgment interest against them on the sellers' breach of contract claim pursuant to Civil Code section 3287. In support of this contention, they argue: (1) that plaintiffs' request for such interest was procedurally defective, denying them sufficient notice and an adequate opportunity to respond in writing and be heard; and (2) that the circumstances of this case do not satisfy the requirements of section 3287.

Civil Code section 3287, subdivision (a) says: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." As can be seen in the text just quoted, section 3287 "requires both certainty and vesting before prejudgment interest can be recovered." (*International Currency Technologies v. ICT, Inc.* (2025) 112 Cal.App.5th 639, 644 (*International Currency*).)

It does so to "balance[] the 'tension' between compensating plaintiffs for their losses and maintaining fairness for defendants." (*International Currency, supra,* 112 Cal.App.5th at p. 646.) " 'From a plaintiff's perspective, prejudgment interest compensates for the loss of the use of the [plaintiff's]

38

money during the period between the assertion of the claim and the rendition of judgment.' " (*Id.*, quoting *Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 294.)  And, "[f]rom a defendant's perspective, section 3287(a) 'promotes equity' because it provides for the recovery of prejudgment interest only when there is certainty about the amount owed." (*International Currency,* at p. 646, quoting *Watson Bowman,* at p. 293.)

In its final statement of decision, the trial court said that the amount of contract damages it was awarding in favor of plaintiffs and against the escrow defendants was "$2,580,400.00 in seller financing loans."  On the one hand, inasmuch as this amount equals the sum of the three carryback loans, one could say there was never any uncertainty about the amount owed.  On the other hand, because of the existence of the failure-to-mitigate-damages defense, it could be said there *was* uncertainty as to what *portion* of that amount should be the responsibility of the escrow defendants.

In all events, the contours of the escrow defendants' assertion of the failure-to-mitigate-damages defense (including whether and, if so, how and to what extent the escrow defendants rely for this defense on conduct that post-dates, pre-dates, or post-dates *and* pre-dates the close of escrow) are unclear. For this reason and to address the escrow defendants' due process concerns (i.e., by affording them the opportunity they claim to have been denied below to adequately brief and argue the matter of prejudgment interest to the trial court), we instruct the trial court on remand to reconsider on a regularly noticed motion whether and, if so, in what amount, prejudgment interest should be awarded to the sellers for the escrow defendants' breach of contract.

## III. DISPOSITION

The judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Specifically: We reverse the portions of the judgment (1) adjudicating the sellers' quiet title and cancellation of instruments claims in favor of Cardenas and against the sellers, (2) quieting title to the properties in Cardenas, (3) adjudicating Cardenas's waste and ejectment claims in favor of Cardenas and against the sellers, (4) awarding Cardenas damages on the waste and ejectment claims, (5) finding in favor of Franklin on the claim that it aided and abetted the escrow defendants' breaches of fiduciary duties, and (6) awarding prejudgment interest to plaintiffs on their breach of contract claim against the escrow defendants. We remand the matter to the trial court with instructions (1) to enter judgment on remand (a) quieting title in fee simple to the properties in the sellers as against Zenith and Cardenas, free and clear of any claimed interests by Zenith or Cardenas, as of September 28, 2017,[32] and (b) cancelling the Cardenas deeds of trust and the trustee deeds, (2) to consider (a) the sellers' quiet title claim as pleaded against Sabahi,[33] (b) plaintiffs' claim against Franklin for aiding and abetting the escrow defendants' breaches of fiduciary duties, and (c) the escrow defendants' failure-to-mitigate-damages defense, and (3) to reconsider on a regularly noticed motion whether and, if so, in what amount, prejudgment interest should be awarded to the sellers for their breach of contract claim against the

---

[32]   We express no opinion as to effects that the quieting of title in the sellers as against Zenith and Cardenas may have with respect to the right, title, or interest of any *other* person in or to any of the properties.

[33]   See fn. 24 *ante*.

40

escrow defendants.  In all other respects, the judgment is affirmed.  No party is entitled to costs on appeal.

KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


RUBIN, J.